### ATLANTIC REFINING CO. v. JAMES B. BERRY SONS CO., Inc.

No. 6213.

Circuit Court of Appeals, Third Circuit.

Dec. 21, 1937.

On Rehearing Dec. 21, 1938.

On Second Rehearing Sept. 27, 1939.

BUFFINGTON, Circuit Judge, dissenting.

———◇———

Brown, Critchlow & Flick, of Pittsburgh, Pa. (Theodore S. Kenyon, Edgar F. Baumgartner, and Joseph V. Meigs, all of New York City, of counsel), for appellant.

Wm. F. Hall, of Washington, D. C., and Thomas G. Haight, of Jersey City, N. J., for appellee.

Before BUFFINGTON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BUFFINGTON, Circuit Judge.

This case concerns the recovery, by a single distillation of crude petroleum, of its by-products. The recovery of such by-products by successive distillations was well known, but this patent concerns the obtaining of such by-products by a single, as compared with recovery by additional, successive, distillation.

In a general way we may say that distillation is effected by the fact that crude petroleum vaporizes at different degrees of heat and in and from such different vapors various by-products are secured. The different temperatures at which vaporization takes place were well known and the apparatus and processes for securing desired by-products from such different heat zones were known and used. But to obtain all the by-products the art practiced different distillations. In other words, it practiced successive, isolated, or what may be termed tandem distillations, in order to recover all the by-products. Such successive distillations were regarded as a necessary burden in the art, although they required additional expensive apparatus, delay, and the additional labor and fuel incident thereto. For example, one apparatus could by one distillation recover those by-

products incident to vaporization at the highest and lowest vaporization heat points, but to recover the by-products at the intermediate vaporizing points the returning, undistilled, and unvaporized liquid was, as we have said, subjected to a further distillation process in order to thereby vaporize and recover their by-products. In other words, there was a second, triple, and indeed in some cases five successive, isolated, independent distillations of the unvaporized fluid, undistilled by previous operations. Thus liquidation by what was known as bubble towers was a common practice wherein the recovery, for example of gasoline, was effected by superheating, and the recovery of other products, for example kerosene, gas, oil, and light lubricants, was effected at what we may call subheating, vaporizing points and the unvaporized liquid had to be subjected to another distillation process where such liquid vaporized at points intermediate the highest and lowest vaporizing heat incident to the primary distillation points of the then art practice. So also steaming towers were used. The apparatus and process of the prior art was tersely summarized in the testimony of a witness who knew and practiced the art. We find no testimony to the contrary by any witness who took part in the practical art. His testimony is: "With these earlier fractionating columns we took from that column only two products, a top and a bottom product. And if we wanted an intermediate product, we ran it through another still and a separate fractionating column; all steps were successive. So that for each intermediate product we had to have another still and another fractionating column."

He further said, referring to other apparatus: "They started off with two of those towers, and finally ended up with five, * * * We made either five or six cuts from those stills. Five or six streams; they were not to specifications. To get them to specifications we took them out and re-ran them."

Now it is asserted that Lewis in his patent No. 1,680,421, granted August 14, 1928, for "Fractional Distillation," first disclosed the possible use of a distillation process which in one distillation effected the result only obtainable in the prior art by one, two, or even some six, distillations. Did he do so? In that regard we note that the trial judge made no finding of fact that

the unitary complete distillation process of the present patentee was disclosed in any prior patent or in any proven practice. In the absence of any such finding it is our right and duty to make a finding in that particular. In that regard we have the uncontradicted proof of the witness quoted above.

Indeed, in the view the trial judge took of the case, namely, that the patent was a mere aggregation of old elements and not a co-operating combination, it was not necessary to pass on the question of novelty, for his finding was that the process of the patent presented nothing but an aggregation of elements, each of which was old in the distillation art. In our view the question was broader than this finding and the disposition of the case necessitates a finding whether the single, unitary distillation was first disclosed by the patentee.

Finding then, as we do, that the disclosure was novel, the next question arises, was it a mere assembling of known elements in which each element did in combination do the same thing and perform the same function which each element did in isolation, or did the combination of old, isolated and non-co-operating agencies effect a new result in combination? That it effected a new result must be conceded. None of these known agencies could completely distil petroleum. The work of each was limited to a single type of distillation and the extraction of particular by-product, or products. In full possession of all these agencies used in successive, tandem operations, no one suggested or found any way in which, by the use of these agencies or the making of new distilling apparatus, to distil crude oil in a single, unitary distillation which could extract all possible by-products. While the former practice created the problem, it did not solve it. How the patentee solved the problem and the process and means to effect unitary distillation are stated in his application and are summarized in the claims in suit as follows:

"1. In the art of fractionally distilling hydrocarbon oils, the method which comprises passing vapors of the oil counter current to and in contact with reflux oil, withdrawing a portion of the reflux oil intermediate the lightest and heaviest fractions, passing the reflux oil so withdrawn counter current to steam in contact therewith to remove low boiling components, thereby yielding an intermediate fraction

of higher flash point, and continuing the other portion of the reflux oil counter current to the vapors in an earlier stage of the fractionating system.

"2. In the art of fractionally distilling hydrocarbon oils, the method which comprises passing vapors of the oil counter current to and in contact with reflux oil, withdrawing a portion of the reflux oil intermediate the lightest and heaviest fractions, subjecting the reflux oil so withdrawn to direct contact with steam to separate low boiling point components, returning the vapors of the separated low boiling components into the fractionating system, and continuing the other portion of the reflux oil counter current to the vapor in an earlier stage of the fractionating system."

From these it will clearly appear that no old element continued to work in its old way to produce certain by-products, but that each and every element was necessary and co-operated in a new way to effect complete recovery of all by-products by an unitary, single, and all-effective distillation. Was it useful? This great record, the earnest contest made, the effort of the plaintiff to enforce its granted claims, and the effort of the defendant to invalidate the claims, bear silent testimony to its great worth in their regard. Indeed, the proof of its usefulness is shown by the uncontradicted proofs. A witness familiar with the working art, contrasting the advantages of an unitary process over the old practice, says:

"And I know we have what the saving is of one piece of equipment as against another, and we have records of that.

"I don't know specifically how much we save on this rectifying column and the pipe heater over the shell still, but I know we have just shut them down, and the standards, the amount of dollars we spend per month, are tremendously reduced; and the labor requirements are reduced by equipment of that description; fuel is reduced. We haven't the radiation losses and everything else you have in shell still equipment. In innumerable ways there are savings, but I am sorry I can't tell you specifically what they are.

"A large part of that saving would not be due to this very efficient pipe heater we have; the biggest saving in that equipment is prevention of rerunning and rehandling of stocks. That is what every refinery is trying to work up. * * *

"Then we have another added feature, the stripping of these side streams, which makes the tower and everything possible. In other words, I think the thing was a development of trying to get an efficient heating unit, an efficient fractionating unit, and something where you could make all your cuts, do the whole job, in one unit; and I think all of these aims were at the same point—to permit of effecting all of these economies in one unit."

Another witness, referring to unitary distillation plants, testified:

"These pipe still bubbler tower combination installations usually replaced the old type of shell still, i. e. a battery, one or more batteries, of shell stills. The advantages of a tube still installation over the old type continuous battery of shell stills consist of a largely reduced fuel consumption, reduced steam and water consumption, and reduced man-power, i. e. reduced labor costs. It also very materially reduces the amount of ground covered. * * *

"Such equipment, either of ours or of our competitors, has gone into every refinery of importance in this country since 1928."

It is clear that the tandem distillations of the old and now abandoned art required separate, additional distillation equipment of large magnitude and great cost, additional fuel, additional labor, additional oversight, and additional ground. All this was done away with by the substitution of a single plant, a single distillation, and such a by-product recovery as no one of the old agencies could by their distillation effect. Manifestly, a patentee who first showed a simple way by which these supposed necessary elements of cost, labor, fuel, and ground, were done away with and in their stead showed an unitary operative distillation process, made an important step in advance and met the requirements of the Federal Constitution, art. 1, § 8, cl. 8, U.S.C.A., which provided: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

So regarding, we hold the claims in suit valid. That they were infringed was a fact found by the trial court and we find no error in the court so finding. The claims here involved are not for an apparatus, but for a process which the patentee show-

ed could be used in an apparatus such as he showed. Assuming the defendant's apparatus differs in some inconsequential details or in additions to the illustrative apparatus shown in the patent in suit, such differences cannot make it a noninfringer of the patented process. It follows, therefore, the record must be remanded to the court, with instructions to reinstate the bill, enter a decree of infringement and accounting.

## On Rehearing.

BIGGS, Circuit Judge.

This case was an appeal from a decree of the court below holding invalid claims 1 and 2 of United States Patent No. 1,680,421, issued to the appellant, The Atlantic Refining Company, upon August 14, 1928, as assignee of Joseph W. Lewis, Jr. Heretofore we filed an opinion in this cause sustaining the validity of the claims in issue and holding them to be infringed. On motion, a rehearing was granted and the case heard anew. After due consideration had, the Court finds no reason to differ from its former holding that the patent was valid and infringed, but in view of the earnestness of counsel for defendants and the importance of the case, the Court deems it proper that an additional opinion be filed meeting specific contentions made on the rehearing.

The patent is one for the fractional distillation of hydrocarbon oils or petroleum. Methods for the fractional distillation of petroleum were well known prior to the issue of the Lewis patent. The classic method of distillation consisted of heating the oil in a pot or still to high temperature whereupon the more volatile hydrocarbons constituting the lighter fractions rose as vapor to the top of the distilling unit and were thence drawn off, while the heavier hydrocarbons, viz., those with a higher boiling point, remained in the bottom of the distilling unit. These were known as the heavy ends or "bottoms". This comparatively crude method of distillation resulted in portions of the heavier ends being carried off with the more volatile hydrocarbons and conversely a portion of the lighter hydrocarbons remained in the bottoms. The results therefore were two fractions neither of which was cleanly cut to boiling point.

In the art of petroleum distillation the fractionating tower or rectifier early made its appearance. Certain of these were known as bubble towers and contained a series of plates arranged in the tower in such wise that as the lighter hydrocarbons rose up through the tower the heavier ends condensed upon the plates and flowed downward from plate to plate towards the bottom of the tower. By the use of the bubble tower it was possible to get a sharply defined overhead product or distillate composed of the lighter hydrocarbons, such as gasoline oils, and a sharply defined residue or bottom product which contained such heavier hydrocarbons as lubricating oils. The products thus created were condensed, if condensation was required, and were drawn off into storage tanks. The downflowing stream of heavier hydrocarbons from bubble plate to bubble plate in the fractionating tower became known to the art as "reflux".

As the art progressed substantial improvements were made in the process just referred to. It was found that if steam was applied at the base of the fractionating tower below the first bubble plate so that the reflux passed down the tower counter current to rising steam, the lighter hydrocarbons were "stripped" out of the reflux because the steam operated to reduce the pressure of the atmosphere upon the hydrocarbon vapors in the tower; that is to say, the steam had the effect of supporting some part of the atmospheric pressure within the tower and thus released from the vapor the lighter ends which had been weighted down with that pressure. It was also discovered that if a draw-off line was placed at an appropriate point between the bubble plates in the fractionating tower intermediate hydrocarbon fractions might be drawn from the tower, the remaining condensates continuing down the tower counter current to the rising vapors as before. See the Weisberg Patent No. 1,676,232, of July 3, 1928, issued upon an application filed November 29, 1921, and the Leslie and Baker Patent No. 1,868,466 of July 19, 1932, issued upon an application filed June 29, 1925. But the intermediate fractions so drawn off were not clearly cut as to light and heavy ends and required further distillation to become the standard fractions required by the petroleum industry.

In the Primrose Patent No. 1,614,689 of January 18, 1927, and its accompanying figure, issued upon an application filed April 7, 1921, cited by the appellee, three side stream draw-offs are illustrated. These, however, pass the hydrocarbon vapors into a single collecting unit. Thence the vapors move into the first of a series of connected

condensers from which lines run to tanks for the storage of standard fractions. The stripping of the Primrose process was performed by open steam shot into the condensers. There was also a connection between and at the bottoms of the respective condensers leading back into the fractionating tower.

In the Peterkin Patent No. 1,709,874, and its accompanying illustration, issued April 23, 1929, upon an application filed June 4, 1925, also cited by the appellee, a system is disclosed whereby petroleum is run from a pipe still or heater into an exhausting chamber or stripper which constitutes the bottom section of a fractionating tower and the reflux passes down the tower counter current to rising vapor and steam. The lighter hydrocarbons are drawn out of the upper end of the column into a condenser and move thence into a flow box in which the oil is divided into two streams, one stream moving to storage, the other returning to the top of the fractionating tower for further processing. There are also four side streams shown, drawn off from the fractionating column from points intermediate the bubble plates. By these side streams intermediate fractions are drawn out of the fractionating tower into condensers and thence moved to storage. The Peterkin patent also discloses a heater whereby open steam is driven into the stripper. It should be noted however that Peterkin provides no means whereby the vapors of low boiling components taken from the fractionating column by the side strippers can be returned into the fractionating system.

In United States Patent No. 1,868,-466, and its illustration, issued to Leslie and Baker upon July 19, 1932, upon an application filed by them upon June 29, 1925, cited by the appellee, a side steam stripper is disclosed but with a steam heating coil serving in lieu of an open steam stripper, which is placed between the fractionating column and a distillate storage tank. Leslie and Baker also show draw-offs at the top and bottom of the fractionating column for light vapors and heavy ends.

In the Wright and Atwood Patent No. 1,278,280, issued upon September 10, 1918, also cited by the appellee, a process for fractionating liquids by distillation is disclosed. In this patent a series of condensing devices is arranged within a column, each directly above the other and each connected with the next in line. The condensing fluid (named as crude oil) enters at the top of the column and passes successively through the upper and lower pipes of the successive condensing devices to be discharged at the bottom of the column. Outlet pipes lead from the base of each condensing unit whereby draw-offs could be made. When lighter hydrocarbons are obtained than those desired, they are re-evaporated by steam from the collecting units of the condensers and are thereafter condensed again until the desired fractions are obtained. When the fractions desired are obtained, the patent contemplates their withdrawal from the unit.

To refer specifically now to the Lewis patent sub judice we state that the claims in issue, viz., 1 and 2, are as set forth below.[1] The apparatus disclosed by the Lewis patent and its illustration consists of an ordinary pipe still or heater through which the oil is forced at high velocity into a fractionating tower with bubble plates arranged in the manner disclosed by the prior art. A draw-off is shown at the top of the fractionating column whence the lighter hydrocarbons pass into a flow box (as in Peterkin) where the flow is divided, one part passing off into storage for light distillates, the other portion returning to the top of the fractionating column. The bottom section of the fractionating column forms an open steam stripper into which superheated steam

[1] "1. In the art of fractionally distilling hydrocarbon oils, the method which comprises passing vapors of the oil counter current to and in contact with reflux oil, withdrawing a portion of the reflux oil intermediate the lightest and heaviest fractions, passing the reflux oil so withdrawn counter current to steam in contact therewith to remove low boiling components, thereby yielding an intermediate fraction of higher flash point, and continuing the other portion of the reflux oil counter current to the vapors in an earlier stage of the fractionating system.

"2. In the art of fractionally distilling hydrocarbon oils, the method which comprises passing vapors of the oil counter current to and in contact with reflux oil, withdrawing a portion of the reflux oil intermediate the lightest and heaviest fractions, subjecting the reflux oil so withdrawn to direct contact with steam to separate low boiling point components, returning the vapors of the separated low boiling components into the fractionating system, and continuing the other portion of the reflux oil counter current to the vapor in an earlier stage of the fractionating system.

is delivered and from whence it moves up into the fractionating tower. There are also two draw-offs placed between the bubble plates whence side streams pass from the fractionating tower. Thus far it will be observed that there is little difference between the Peterkin patent and the Lewis patent. But Lewis places small fractionating towers, which are in fact auxiliary open steam strippers, upon the draw-off lines so arranged that by means of connecting lines running from their tops back to the main fractionating column the lighter hydrocarbons pass back from the auxiliary strippers to the main fractionating column. Lewis further indicates (by figure 2 of the patent) that the auxiliary steam strippers may be placed inside the main fractionating column instead of outside of it. Whether the auxiliary steam strippers be within or without the main fractionating tower is of course immaterial.

The appellant contends that operation of this apparatus in the manner indicated by Lewis affords a new method of fractional distillation whereby the rectifying effect of the portion of the reflux moving down the main fractionating column is combined with the open steam stripping by the auxiliary fractionating towers of the reflux which is withdrawn through the side streams. The appellant claims that there is a new result produced thereby, viz., the production by a single distillation of intermediate fractions sharply cut at both light and heavy ends. To re-state the appellant's position, as we apprehend it, Lewis combined rectification of one portion of the reflux, namely that remaining within the main fractionating column, with open steam stripping of that portion of the reflux drawn off by the side streams, the lighter ends of the side streams being returned again to the main fractionating column and being there subjected again to the rectifying effect caused by the reflux flowing down the column in counter current contact with the rising hydrocarbon vapors. Lewis teaches that the processes of his distillation method are to be continuously operated in what constitutes in fact a partially closed system, and as the distillation processes are carried on, the lighter ends rise out, the heavier ends fall out, of the intermediate fractions which are thus cut sharply at top and bottom. The appellant contends that commercially usable intermediate fractions are thus obtained. This is a result which prior to Lewis could be achieved solely by repeated distillations despite the elaborate equipment and methods disclosed by the patents referred to heretofore in this opinion.

In our opinion the evidence clearly indicates that Lewis' method does give intermediate distillation fractions which are sharply cut at both ends and which require no substantial further treatment to be commercially acceptable. It is also clear as contended by the appellee that all the tools or devices demonstrated by the Lewis patent are old in the art. A pipe still or heater and an open steam stripping or exhausting chamber adjacent to the bottom of the main fractionating column and within the column is demonstrated by Peterkin. The device of side steam stripping is shown by Weisberg and Primrose. Side stream lines intermediate the bubble plates to withdraw fractions are shown also by Peterkin. A flow box to divide the flow emanating at the top of the main fractionating column to return a portion of it to the fractionating column and to send the rest to storage is taught by Peterkin. The two small fractionating columns or auxiliary steam strippers, whether placed within or without the main fractionating column as taught by Lewis, function individually precisely as do the fractionating columns of the prior art. The heating coil of Leslie and Baker, placed by them outside of their fractionating tower serves of course to raise the temperature of the hydrocarbons. Open steam on the other hand is a stripping agent because it relieves atmospheric pressure. But this difference in so far as the issues raised by the case at bar are concerned is of small consequence.

Wright and Atwood in their patent No. 1,278,280 showed connected condensers, places for draw-offs and re-evaporation of too light ends. Vacuum Oil Company from 1918 to 1928 originally operated a unit similar to that described by Wright and Atwood at Olean, New York. There were substantial subsequent alterations made by Vacuum's engineers in their attempt to cause it to operate with commercial success to distill intermediate fractions of hydrocarbons, but we think it is plain that the device designed upon the Wright and Atwood patent as it was eventually operated possessed but little resemblance to Lewis' system. There is no suggestion by Wright and Atwood of withdrawal of a portion of the hydrocarbons while another portion moves counter current to the rising vapors in the earlier stages of a fractionating system. As a matter of fact we can perceive no provision

made in the patent for passing the liquid down through the bubble plates or .trays.

The appellee's testimony to prove that the Wright and Atwood process was suc-- cessfully used with modifications to achieve the results that Lewis achieved is unconvincing. The experiments carried on at Olean were unsatisfactory and were abandoned. There is evidence that the Wright and Atwood unit was supplanted by a Foster-Wheeler fractionating unit operating substantially in the manner of the appellee's.

In respect to Shell Company's operations at Martinez and Wood River which the appellee contends shows anticipation, we think these operations ' may be plainly distin-. guished from the Lewis method. There was no splitting of the reflux. There was no return of stripped vapors to the fractionating system to constitute any kind of a continuous distillation. Moreover, the evidence of the Shell Company's records' shows that that- company incurred much trouble with the process employed. There. was in fact the requirement of redistilling the distillates, lack of success from the employment of the process as a whole, and the final abandonment of it.

The individual tools of the art suggested by Lewis are indeed old, but there is an essential difference .between the prior art and Lewis' method. The device of using auxiliary fractionating towers or steam strippers connected back to the main fractionating column whereby lighter hydrocarbons are returned to the distillation processes of the main column, while the heavier ends go on to storage, is new in the art and gives a new and commercially valuable result, largely accomplishing in one continuous process what theretofore had required several separate distillations.

The record shows the commercial success of the Lewis method. But it is the law that the test of commercial success may be. applied only when the question of novelty is fairly open to doubt. See Lyman Gun Sight Corporation v. Redfield Gun Sight Corporation, 10 Cir., 87 F.2d 26; Ottenheimer Bros. v. Libuwitz, 4 Cir., 87 F.2d 190, and Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049. It is true also that the method employed by Lewis now appears obvious, but the result of the operation of genius frequently seems so. The question of whether Lewis' achievement rises to the dignity of invention or. whether it consti- tutes mere mechanical ingenuity as found

by the learned District Judge is the real question before us.

Much has been said in respect to what constitutes inventive genius. We think that we can add little to that which has already been said upon that subject. We state that in our judgment the step taken by Lewis appears to be more, much more than the mere exercise of the mechanical ingenuity of one skilled in the art of petrolum distillation, more than a new use for the old tools of the art. We think that it does in fact constitute inventive genius. The defense offered is a mosaic defense and as was said by this court in Craft-Stone, Inc., v. Zenitherm Co., Inc., 3 Cir., 22 F.2d 401, 402, "The patentee invented a new and useful product, and it is not permissible for an infringer to go to the prior art and defeat the patent by selecting the various elements of the patentee's process from different patents, bring them together, and say that this aggregation anticipates. Knowledge after the event is always easy, and problems once solved present no difficulties. [Webster] Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Diamond Rubber Co., etc., v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444,- 55 L.Ed. 527." In the case at bar the defense offered must fall. It may not be sustained against the disclosures of the Lewis patent.

After rehearing and full consideration we are confirmed in our prior conclusion. The Lewis patent constitutes invention over the prior art and the claims in issue are valid claims and must therefore be upheld.

The appellee's process is almost identical with the Lewis method and clearly infringes the claims sub judice.

In respect to the charge that the appellant comes into court with unclean hands, we concur in the finding of the trial court. There is not sufficient proof of conduct upon the appellant's part which would lead us to sustain this defense. Nor is release by way of license shown.

As stated in our prior opinion the decree of the court below is reversed and the cause is remanded to the court below with instructions to reinstate the bill of complaint and enter a decree of infringement and for an accounting.

Sur Second Rehearing.

BIGGS, Circuit Judge.

Following rehearing and decision in this case, another petition for rehearing was

filed by the appellee. Entertaining doubt as to the correctness of our prior decisions, we ordered reargument, which was made by counsel upon all phases of the case.

In our previous opinion we emphasized the fact that the Lewis patent showed a means for returning the lighter hydrocarbons to the main column from the auxiliary fractionating towers. We therefore attached importance to a feature of the Lewis process which was not an essential to its operation. Though Lewis shows means for returning the vapors of the low boiling components to the main fractionating column, such means are rarely made use of in the Lewis process. We deem it necessary, therefore, to consider the Lewis patent again in the light of the prior art. We will discuss five of the patents alleged by the appellee to be pertinent upon the issue of anticipation.

Patent No. 1,676,232, issued to Weisberg July 3, 1928, on an application filed November 29, 1921, discloses a system for the "fractional condensation of mixed vapors." Weisberg displays a fractionating tower or column so arranged that all of the vapors enter at the bottom of the column and pass up through plates spaced at intervals through the tower. Caps arranged at each plate force the upflowing vapors through the liquid formed by condensation at each plate. The overflow passes down from plate to plate through connecting pipes. Weisberg shows two side stream draw-offs, a vapor outlet running from the top of the column as a means of withdrawing the lighter hydrocarbons and a condensate outlet at the bottom of the column for removing the bottoms to storage. Weisberg makes no provision for stripping any of the fractions taken out of the tower. We find in the patent however reference to the principle of reflux, though not in the terms expressed by Lewis. Weisberg refers to an arrangement of tower "sections", so that the mixed vapors and the condensate "flow through them in series but in counter-current direction to each other, thus bringing the heavier condensate and mixed vapors into heat interchanging relationship."

We have attached the drawing accompanying the patent to the appendix to this opinion.

Two patents issued to Peterkin and others are alleged by the appellee to constitute part of the anticipation of Lewis contained in the prior art. Patent No. 1,709,874 was issued April 23, 1929 on an application filed June 4, 1925. A method for the distillation of oils is disclosed. Draw-off lines are shown running from a fractionating column. Intermediate fractions are to be run to coolers and thence to storage. A pipe is connected with the bottom of the column and a chest delivers superheated steam into its bottom section. This arrangement strips the heavy ends, but there is no provision made for stripping the intermediate fractions. The vapor inlet pipe is shown between the second and third bubble plates at a position almost identical with that shown by Lewis. The Peterkin patent is designed for the primary purpose of obtaining distillation while avoiding cracking. Peterkin makes reference to steam stripping of the lower ends within the tower for he states, "The unvaporized oil flows downwardly in the tower C, while in intimate contact with the upwardly flowing steam, accumulating at the lower end thereof as bottoms, with resultant vaporization of lower boiling point components, and imparting to the bottoms a higher flash test. The bottoms are continuously or at suitable intervals drawn off through the cooler F to the storage tank S." The principle of reflux is not referred to. Peterkin sought to combine the function of the steam stripper for the bottom fraction with the withdrawal of intermediate fractions from the tower, but he seeks to do nothing more.

A copy of the drawing accompanying the patent is contained in the appendix.

A second patent for oil distillation was granted to Peterkin and his collaborators on April 23, 1929, upon an application filed April 14, 1926. Since Lewis' filing date is earlier, this patent cannot be considered as part of the prior art.

Patent No. 1,614,689 was issued to Primrose January 18, 1927, on an application filed April 7, 1921. This patent is for an "improvement in processes for distilling crude oils." Oil vapors are run through "a tower or like device where the volatile vapors are separated from the remaining oil or residuum, and are then passed through a series of air cooled condensers, the temperature of each being controlled by the amount of air passing through it, so as to condense out the heaviest hydrocarbon vapor, the remaining vapor being passed to the next succeeding air cooled condenser and so on through the series." Nothing thus far hints of any stripping process. Primrose provides, however, in a later passage of the patent for the conveyance of superheated steam to the

652

bottom of each condenser and of the separating tower, "so that the vapor tension in each may be regulated to produce the distillate required." The condensers therefore operate as steam strippers much as do the auxiliary fractionating towers of Lewis. It follows, says the appellee, that Primrose preceded Lewis in improving the flash point of the intermediate fractions withdrawn from the tower by stripping them with open steam. The Primrose patent, however, shows three draw-off lines, running into one undivided chamber and that chamber is connected by a single pipe to the first of the four condensers. The oil vapor is introduced at the top of the tower. The principle of reflux moving countercurrent to the rising hydrocarbon vapors is not referred to by Primrose. As a matter of fact there would be no chance whatsoever of obtaining fractions closely cut at their upper ends in the operation of the Primrose apparatus, for the side stream draw-off is close to the top of the tower and not far from the inlet pipe. Therefore, there would be constant contamination of lighter hydrocarbons by the inflowing vapors containing heavy ends continuously arriving through the head of the tower. Primrose shows nothing more than a series of heat treatments of a single intermediate and contaminated fraction drawn from the tower. Primrose certainly does not anticipate Lewis.

The drawing accompanying the Primrose patent is attached to the appendix.

In Patent No. 1,868,466 issued to Leslie and Baker the appellee claims that there exists an almost word for word anticipation of Lewis. This patent issued July 19, 1932 upon an application filed June 29, 1925. We have appended a copy of one of the drawings accompanying the patent to this opinion. Leslie and Baker state in their specification:

"This invention relates to distilling processes and apparatus; and it relates more particularly to processes of and apparatus for distilling petroleum to produce therefrom one or more distillates of closely controlled composition, together with a residuum substantially free of components properly characterizing the distillate or distillates sought.

"A principal object of the invention is to provide a simple, effective, and economical method for the continuous distillation of petroleum or other liquid of mixed composition for production of distillates of the character above mentioned. A further object of the invention is to provide apparatus whereby the foregoing object may be achieved while at the same time utilizing to a large extent previously installed refinery equipment, such as batteries of stills, by associating with such equipment suitable fractionating apparatus, thus providing a complete apparatus system appropriate for practicing the invention at the lowest cost consistent with the accomplishment of the desired result."

As to the actual operation of their process Leslie and Baker state:

"The vapors from each still are introduced into a suitable rectifying or fractionating system at suitable points. In the installation illustrated in Fig. 1, this rectifying or fractionating system consists of a single fractionating column, indicated generally at C, having an appropriate number of bubbler-cap sections which may be of any usual or suitable design. It is not essential that the rectifying column be of the bubbler-cap type, the essential point being that the apparatus be of such character as to afford full opportunity for countercurrently contacting upwardly flowing vapors with downwardly flowing liquid under conditions ensuring an approximation to equilibrium conditions at all points in the rectifying system. Such conditions can be realized in certain other forms of columns, such as packed columns, for example. In general, the distillation vapors from the several stills of the battery should be introduced into the fractionating column at such respective points that the vapors introduced at any one of said points will be, as nearly as is practically possible, in equilibrium with the vapor and liquid within the column at that point when the entire battery of stills and the column are functioning smoothly and properly in the regular course of operation.

"* * *

"At 34 is indicated a small exhausting column into which liquid from the bottom of the main fractionating column C may be run. The use of this exhausting column is optional and is dependent upon the nature of the product that it is desired to obtain from the bottom of the column. Ordinarily, the apparatus may be so run that the liquid from the bottom of the column contains a negligible proportion of gasoline, say less than one to three percent. If it were desired to produce from the bottom of the column a liquid product containing no gasoline and possibly not even a lighter part

of what is normally kerosene, this could be done by using the exhausting column referred to. Heat must be supplied in the form of vapor to the bottom of the exhausting column and this is done by means of a small auxiliary heater (not shown). In the present example the liquid from the bottom of the main fractionating column C is shown entering the top section of the exhausting column 34, while the vapors from the exhausting column leave through vapor off-take 35. The exhausting column is particularly useful in any case where it may be desired for any reason to run the rest of the battery in such manner that the liquid leaving the bottom of the main column contains a substantial percentage of gasoline or other distillate below the particular cut point.

"Where the exhausting column 34 is not employed, or at least operates on less than all of the liquid leaving the bottom of the column C, liquid leaves the bottom of said column C through pipe 36 which delivers it to cooler 37. In the present example this liquid may be assumed to be a gas-oil fraction. If the kerosene can not be included either in the gasoline or in the gas-oil fraction, it must be withdrawn at some intermediate point along the column. In the present instance, the kerosene fraction is withdrawn through pipe 38 and header 18ª from that section of the column C indicated at 39. This kerosene fraction is delivered into an exhausting column 40 which contains a heating coil 41 in its base. The vapors leave the column 40 through pipe 42 and pass to condenser 43 where condensate is formed and refluxes through pipe 44 back to the top of the exhausting column 40; while the uncondensed vapors are delivered through pipe 45 to vapor-manifold 46 from which they can be directed into any desired section of the fractionating column C. In this way, liquids of various compositions can be removed from the column C through suitably located draw-off lines, 38, 38ª, 38ᵇ, 38ᶜ, and any one of the liquids so removed may be treated in an exhausting column as desired. That is, if it be found that from no section of the column can a liquid of exactly the desired composition be withdrawn directly, this procedure can be adapted to obtain a liquid of the composition desired. A liquid can be withdrawn from some one section of the column C that is of such composition that its higher boiling portion is satisfactory. The volatile end of this liquid can then be removed in an exhausting column

and the vapor so formed returned to the column C at the point where it is most nearly in equilibrium when the column is operating normally.

"If desired, that portion of the auxiliary exhausting column 40 above the feed section into which liquid is delivered through pipe 38 may be omitted. The sections above this feed section perform a rectifying function, and in some instances would be unnecessary because it would be immaterial whether a portion of the heavier components in the liquid fed in through pipe 38 was or not vaporized and returned to the main column C. If the upper sections of column 40 were omitted as suggested, it would mean that the liquid fed to the top of the exhausting column through pipe 38 would function as the reflux, the arrangement in this case being similar to that shown for the other exhausting column 34."

Claims 1 and 2 of this patent are for apparatus. Claim 3 is for the process, as follows:

"3. The process of distilling liquids of mixed composition which comprises passing such a liquid serially through a plurality of suitably heated distilling chambers, conducting evolved vapors from all of said distilling chambers into a unitary rectifying system, condensing rectified vapors leaving said rectifying system, providing a rectifying counterflow of liquid in contact with said vapors in said rectifying system by refluxing at least a part of the condensate from said rectified vapors to said rectifying system at a point adjacent where said rectified vapors leave said system while avoiding introduction of counterflow liquid, as such, elsewhere into said system, the evolved vapors from each of said distilling chambers being introduced into that part of said rectifying system where they will be respectively substantially in equilibrium with the vapor and liquid in said system, removing from said rectifying system an intermediate fraction of an approximately desired composition, exhausting said fraction of its more volatile portion to obtain a product of an exactly predetermined composition, returning said more volatile portion to the rectifying system at such point as to be in substantial equilibrium with the liquid and vapor in said system, and withdrawing a desired distillation product from a point in the combined rectifying and condensing system."

The claims of the Lewis patent in issue are set out in a foot note to our previous

opinion. The Lewis claims and that of Leslie and Baker just quoted are notable in their similarity. The exhausting columns referred to by Leslie and Baker are closed steam strippers. The auxiliary fractionating towers of Lewis operate as open steam strippers. The exhausting column 34 is designed to strip the lower intermediate fractions. Numerous side steam draw-offs lead by a connection to the exhausting column or closed steam stripper shown at 40. That Leslie and Baker refer to the function of the reflux is indubitable. The patent, however, is a paper patent. There is no evidence which could lead to the conclusion that the system of distillation therein disclosed was ever operated with success to achieve intermediate fractions sharply cut at their upper ends. It may serve as anticipation nonetheless, if it discloses a process or apparatus giving the result which Lewis gives.

The problem in respect to anticipation is the following. Leslie and Baker have put the elements of the Lewis process upon the pages of their patent. The principle of reflux is referred to; the exhausting columns or steam strippers are present. Leslie and Baker refer to the very ends which Lewis attains. Apparatus is displayed and a method of operating that apparatus to the stated ends is disclosed. It is all set forth; but will the process work as it is disclosed? If so, anticipation is clearly shown.

We state as our opinion that the Leslie and Baker process and apparatus will not give the results which Lewis demonstrably has obtained, viz., hydrocarbon fractions sharply cut at their upper ends. The Leslie and Baker apparatus and process does not disclose a workable system which will give the results claimed for it. The reasons for this conclusion are as follows. In Figure I of the patent, the figure used by the patentees to display the working of their apparatus and process, Leslie and Baker show a series of stills, four in number, hooked tandem, which pass their contents into the fractionating column at various points intermediate the top and bottom. As has been stated, the draw-off lines run from the side of the fractionating column at points intermediate its top and bottom. The side streams are run to exhausting columns and thence to storage. But the insurmountable difficulty which lies in the way of obtaining sharply cut fractions free of heavy ends in the Leslie and Baker process lies in the position of the vapor-intake pipes lead-

ing into the column from the four stills. Two of these are above the midsection of the column; one, that leading from Still I, comes into the column near its top. Since hydrocarbon vapors come from Still I into the fractionating column at a point not distant from its top, the reflux must contain heavy ends. That portion of the reflux which is not withdrawn to the side steam stripper 40 remains in the tower but cannot move in effective counter-flow contact with the vapors coming into the tower in the earlier stages of the fractionating process, as, for example, from Still IV. The vapors from the four stills cannot come into effective contact with one another or with the reflux, for they are fed into the tower at different levels. Inevitably, the side stream to the stripper 40 must be contaminated with the heavier hydrocarbon vapors.

The appellee points out that Leslie and Baker state that the contents of the side stream in respect to "its higher boiling portion is satisfactory", but there is no evidence to support this statement of the patentees. That the appellee realizes the existence of the difficulty we have referred to is apparent from its argument, for the appellee states, "Manifestly Leslie could have run all of the vapors from his stills I, II, III, and IV, into a common pipe, such as that designated at II in the Weisberg patent, and introduced them all into the bottom of the rectifying column, às Weisberg does, and as Peterkin passes all of the vapors from the separating chamber into the bottom of his rectifying section." Leslie and Baker could have shown this but they did not show it.

Moreover, Leslie and Baker admit that the intake into the column from Still I must contain a proportion of the higher boiling constituents of the petroleum. These must move downward with resulting contamination to the upflowing hydrocarbons and the side stream. Indeed Leslie and Baker state that if the intermediate fractions are to be free of heavy ends, they must be withdrawn as vapors and not as liquids. It is our conclusion that the result of the operation of the Leslie and Baker process and apparatus cannot produce the products claimed for it. We conclude, therefore, Leslie and Baker cannot be deemed to anticipate Lewis.

We have set forth the drawing accompanying the Lewis patent in the appendix. In Lewis the vaporized petroleum enters the fractionating column between the second

and third bubble plates of the fractionating tower, a point well down the tower. The vapors proceed upwards through approximately three-fourths of the height of the column. The uncontaminated reflux moves down in counter-current contact with the rising vapors.

Lewis combines the principle of reflux with the effective use of side stream draw-offs further treated when withdrawn from the main column by the auxiliary fractionating towers as part of a continuous system. The side streams, sharply cut at their upper ends, are gotten out of the tower and given further treatment while the fractionating process continues within the main column. While withdrawing side streams, Lewis continues the balance of the reflux down through the column. The side streams withdrawn are raised effectively in flash point by the auxiliary fractionating columns which serve as open steam strippers. The result is one which the art had sought, but which had not been achieved prior to Lewis. The great commercial success of the Lewis process cannot be doubted.

The individual tools of the art used by Lewis are old. He has combined them, however, to reach a useful and, in a limited sense, a new result. The employment of the principle of reflux and of auxiliary steam strippers placed outside the fractionating column but not connected therewith to achieve desired fractions of hydrocarbons, was old, but this had not been accomplished in a continuous process with the auxiliary fractionating towers connected to the main column. So much is new. The essential point which Lewis grasped was the necessity of putting the vaporized hydrocarbons from the still into the fractionating column at such a point that the incoming vapors with their heavy ends would not contaminate the side streams in conjunction with the cutting of the side streams to the desired flash point by auxiliary fractionating towers or strippers. Weisberg and Peterkin seem to have grasped it likewise.

That Lewis has shown mechanical ingenuity in adding the auxiliary steam strippers is not open to doubt, but has he displayed inventive genius? This is the crux of the case at bar in view of the fact that no exact anticipation is displayed in the prior art. His disclosures seem the result of a regular development of the art of fractionating hydrocarbons, he adding an ingenius and commercially valuable step.

But, in the light of the development of the prior art, we cannot conclude that the end which Lewis achieved was the result of that incandescent and illuminating instant in which the mind grasps a hitherto undisclosed principle and with it achieves a new result whether by new tools or old. Lewis must be held not to have displayed inventive genius.

We therefore reverse our former conclusions and hold that the claims sub judice are invalid for want of invention.

Accordingly, the decree of the court below is affirmed.

DICKINSON, District Judge, participated in this decision.

BUFFINGTON, Circuit Judge (dissenting).

This case concerns the distillation of crude petroleum—primarily the recovery of gasoline, incidentally of the several by-products of such oil. The resultant gasoline is one of the most, if not indeed the most, important factors in modern civilization, for on gasoline depend wars, transportation by steamers, land carriage of passengers and freight by auto, truck and locomotive lines and the thousand and one stationary plants of commerce, to say nothing of the use of petroleum alone which has largely displaced coal in homes.

Petroleum is in the main distilled by large companies which maintain staffs of the highest technical skill, men versed in the distillation art and eager to note any advance or improvement made by other companies.

The oil distilling art has been and is the subject of numbers and numbers of patents and has resulted in a development of particular staffs in the patent office which by study and experience are fitted to determine that delicate question of the patentability of the varied oil distillation processes submitted to them for patent reward.

It will therefore be seen that a prima facies of unusual weight arises in favor of the patent here involved which, after a protracted inquiry, was finally issued. Seeing then that this patent presumably involved invention, we next inquire what measure of proof does the law require to overcome the prima facies of patent validity.

In that regard this circuit, speaking by Judge Woolley in Skelly Oil Co. v. Uni-

versal Oil Products Co., 3 Cir., 31 F.2d 427, 431, said: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L.T.(N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals, No. 33 of 1928)". This was restated in this circuit in Worthington Mower Co. v. Gustin, 3 Cir., 80 F.2d 594 (petition for certiorari denied, 297 U.S. 725, 56 S.Ct. 500, 80 L.Ed. 1008) and in American Safety Table Co. v. Singer Sewing Mach. Co., 3 Cir., 95 F.2d 543, 550 (certiorari refused, 305 U.S. 622, 59 S.Ct. 82, 83 L.Ed. 397).

Resting on this measure of proof, it is clear from a study of this record that no prior patent or practice showed, or indeed sought to show, the process disclosed by Lewis in his unitary, complete distillation process as contrasted with the multi successive distillation process as the prior art. In that respect the distillation art was stalled and static. Therefore, this court in its decision filed December 21, 1937, 106 F.2d 644, held:

"This case concerns the recovery, by a single distillation of crude petroleum, of its by-products. The recovery of such by-products by successive distillations was well known, but this patent concerns the obtaining of such by-products by a single, as compared with recovery by additional, successive, distillation.

"In a general way we may say that distillation is effected by the fact that crude petroleum vaporizes at different degrees of heat and in and from such different vapors various by-products are secured. The different temperatures at which vaporization takes place were well known and the apparatus and processes for securing desired by-products from such different heat zones were known and used. But to obtain all the by-products the art practiced different distillations. In other words, it practiced successive, isolated, or what may be termed tandem distillations, in order to recover all the by-products. Such successive distillations were regarded as a necessary burden in the art, although they required additional expensive apparatus, delay, and the additional labor and fuel incident thereto. For example, one apparatus could by one distillation recover those by-products incident to vaporization at the highest and lowest vaporization heat points, but to recover the by-products at the intermediate vaporizing points the returning, undistilled, and unvaporized liquid was, as we have said, subjected to a further distillation process in order to thereby vaporize and recover their by-products. In other words, there was a second, triple, and indeed in some cases five successive, isolated, independent distillations of the unvaporized fluid, undistilled by previous operations. Thus liquidation by what was known as bubble towers was a common practice wherein the recovery, for example of gasoline, was effected by superheating, and the recovery of other products, for example kerosene, gas, oil and light lubricants, was effected at what we may call sub-heating, vaporizing points and the unvaporized liquid had to be subjected to another distillation process where such liquid vaporized at points intermediate the highest and lowest vaporizing heat incident to the primary distillation points of the then art practice. So also steaming towers were used. The apparatus and process of the prior art was tersely summarized in the testimony of a witness who knew and practiced the art. We find no testimony to the contrary by any witness who took part in the practical art. His testimony is: 'With these earlier fractionating columns we took from that column only two products, a top and a bottom product. And if we wanted an intermediate product, we ran it through another still and a separate fractionating column; all steps were successive. So that for each intermediate product we had to have another still and another fractionating column.'"

So holding, this court held the patent novel, useful, inventive and infringed.

Thereafter, on petition, a rehearing was granted and after further full argument by counsel and on due consideration had, this court on December 21, 1938, after a comprehensive and exhaustive discussion

of the prior patents, again held the patent valid, as follows, 106 F.2d 647, 650:

"Heretofore we filed an opinion in this cause sustaining the validity of the claims in issue and holding them to be infringed. On motion, a rehearing was granted and the case heard anew. After due consideration had, the Court finds no reason to differ from its former holding that the patent was valid and infringed, but in view of the earnestness of counsel for defendants and the importance of the case, the Court deems it proper that an additional opinion be filed meeting specific contentions made on the rehearing.

\*     \*     \*     \*     \*     \*

"We state that in our judgment the step taken by Lewis appears to be more, much more than the mere exercise of the mechanical ingenuity of one skilled in the art of petroleum distillation, more than a new use for the old tools of the art. We think that it does in fact constitute inventive genius. The defense offered is a mosaic defense and as was said by this court in Craft-Stone, Inc., v. Zenitherm Co., Inc., 3 Cir., 22 F.2d 401, 402, 'The patentee invented a new and useful product, and it is not permissible for an infringer to go to the prior art and defeat the patent by selecting the various elements of the patentee's process from different patents, bring them together, and say that this aggregation anticipates. Knowledge after the event is always easy, and problems once solved present no difficulties. Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Diamond Rubber Co., etc., v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.' In the case at bar the defense offered must fall. It may not be sustained against the disclosures of the Lewis patent.

"After rehearing and full consideration we are confirmed in our prior conclusion. The Lewis patent constitutes invention over the prior art and the claims in issue are valid claims and must therefore be upheld.

"The appellee's process is almost identical with the Lewis method and clearly infringes the claims sub judice."

Subsequently another rehearing was granted, the case again heard and considered, with the result that an opinion is now filed which holds the patent void of patentability.

I respectfully submit the opinion fails to show any error in the second decision of this court filed December 21, 1938. On the contrary, it concedes the novelty, the commercial success of Lewis' process, its adoption by the art, and the defendant's infringement.

Referring to the Lewis process, the latest opinion—italics mine—concedes: *"The result is one which the art had sought, but which had not been achieved prior to Lewis. The great commercial success of the Lewis process cannot be doubted.* The individual tools of the art used by Lewis are old. *He has combined them, however, to reach a useful and, in a limited sense, a new result.* \* \* \* That Lewis has shown mechanical ingenuity in adding the auxiliary steam strippers is not open to doubt, but has he displayed inventive genius? This is the crux of the case at bar in view of the fact that no exact anticipation is displayed in the prior art. His disclosures seem the result of a regular development of the art of fractionating hydrocarbons, he adding an ingenius and commercially valuable step. But, in the light of the development of the prior art, *we cannot conclude that the end which Lewis achieved was the result of that incandescent and illuminating instant in which the mind grasps a hitherto undisclosed principle and with it achieves a new result whether by new tools or old.* Lewis must be held not to have displayed inventive genius." Measured by the test of the necessity of proof of an *"incandescent and illuminating instant in which the mind grasps a hitherto undisclosed principle"*, few patents could be sustained. But on practical, well recognized principles of the patent law, I am constrained to file this respectful dissent which is bottomed on and buttressed by these considerations: First, the prima facies of the patent; second, the opinion of this court stated by Judge BUFFINGTON filed December 21, 1937; third, the opinion of this court stated by Judge BIGGS, on rehearing, filed December 21, 1938; fourth, the fact that the opinion of the court now to be filed, fails to show where the court was in error in its opinions of December 21, 1937 and December 21, 1938. In the opinion of December 21, 1937, the court held—and I have seen no reason in these protracted hearings and rehearings to differ from the facts and reasoning then stated—to wit:

"It is clear that the tandem distillations of the old and now abandoned art required separate, additional distillation equipment of large magnitude and great cost, ad-

ditional fuel, additional labor, additional oversight, and additional ground. All this was done away with by the substitution of a single plant, a single distillation, and such a by-product recovery as no one of the old agencies could by their distillation effect. Manifestly, a patentee who first showed a simple way by which these supposed necessary elements of cost, labor, fuel, and ground, were done away with and in their stead showed an unitary operative distilla-tion process, made an important step in advance and met the requirements of the Federal Constitution, art. 1, § 8, cl. 8, which provided: 'To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.'"

Such being my unchanged view, I am constrained to file this respectful but earnest dissent.

## APPENDIX

July 3, 1928.                                                                1,676,232

### L. WEISBERG
### FRACTIONAL CONDENSATION OF MIXED VAPORS

Original Filed Nov. 29, 1921

Louis Weisberg
INVENTOR

BY
ATTORNEY

April 23, 1929.

**A. G. PETERKIN, JR., ET AL**

DISTILLATION OF OILS

Filed June 4, 1925

1,709,874

INVENTORS

Albert G. Peterkin Jr., William H. Stroud Jr.,

BY and Richard B. Cahill Jr.

Cornelius L. Ehret

then ATTORNEY

Jan. 18, 1927.

**J. PRIMROSE**

**OIL STILL**

Filed April 7, 1921

1,614,689

Inventor
John Primrose

By his Attorneys
Kerr, Page, Cooper & Hayward.

July 19, 1932.

**E. H. LESLIE ET AL**

DISTILLING PROCESS AND APPARATUS

Filed June 29, 1925

1,868,466

3 Sheets—Sheet 1

*Fig.1.*

Inventors
*Eugene H. Leslie,*
*Edwin M. Baker,*
By *[signature]*
*their* Attorneys

Aug. 14, 1928.

1,680,421

### J. W. LEWIS, JR
### FRACTIONAL DISTILLATION
Filed March 25, 1926

INVENTOR.
Joseph H. Lewis Jr

his ATTORNEY