### SEWALL v. PHILCO SHOE CORPORATION.

#### Civil Action No. 42.

District Court, D. Maine, N. D.

Oct. 24, 1941.

Emery, Booth, Townsend, Miller & Weidner, of Boston, Mass., for plaintiff.

Dike, Calver & Porter, of Boston, Mass., and Michael Pilot, of Bangor, Me., for defendant.

PETERS, District Judge.

This is a suit charging infringement of Letters Patent 2,130,968, issued to the plaintiff September 20, 1938, upon an application filed January 3, 1938.

The defendant admits infringement but attacks the validity of the patent, contending that the claims are anticipated by the prior art and that the improvements claimed, if novel in any particular, are the result of mechanical skill and in no degree the result of inventive genius.

### Findings of Fact.

The patent in suit describes a sheet made up of two different materials and a method of cutting out from the sheet, used as a blank, insoles for shoes. The sheets are made up of three or five parallel strips, the contacting edges being bevelled and cemented together to make one composite sheet. Figure 1 of the patent shows a three-strip sheet, the middle strip being of hard, stiff material desired for the heel and shank parts of the insole, and the two outside strips being of the more flexible stuff suitable for the ball and toe parts. The cutting is done with the heel portions of adjacent insoles overlapping each other, or nested in a way to save stock. Figure 5 shows a five-strip sheet which is the same as the sheet shown in Figure 1, except that two narrow strips of hard material are added, one on each edge, in case stiffer toe parts of the insole are desired.

The parties have referred to the sheets of composite material as "strips" and to the narrower sections comprising the whole as "zones" or "bands", and I will adopt that nomenclature.

The claims in dispute are numbers 1 to 4 inclusive and 10, 11, 12, 17 and 18. The claims may be placed in two groups, numbers 1, 2, 3, and 4 being method claims, and numbers 10, 11, 12, 17 and 18 being article claims. A disclaimer has been filed modifying and narrowing somewhat claims in both groups, except 17.

Claim 3 is typical of the group of method claims, and is as follows, using counsel's method of division for the sake of clarity:

"The method of forming a multiplicity of insoles having relatively flexible ball and toe portions and relatively stiff heel and shank portions which comprises

"(1) forming a sheet having

"(a) a zone of the material of which said heel and shank portions are formed

"(b) and, at each of opposite sides of said zone and contiguous therewith, zones of the material of which said ball and toe portions are formed

"(2) and cutting from said sheet a multiplicity of the insoles in such wise that

"(a) the ball and toe portions of adjacent insoles so cut are formed of the zones

at opposite sides respectively of the first mentioned zone while

"(b) the heel and shank portions of all said insoles are cut from said first mentioned zone."

(Added by disclaimer):

"(3) the first mentioned zone being of a width

"(a) at least equal to, but

"(b) much less than twice the length of the heel and shank portion,

"(4) the widest portion B of the heel of each insole being cut from material between the heel and shank portions of the adjacent insoles at either side thereof."

This claim covers preparation of a three-zone strip, the middle zone furnishing the material for the heel and shank parts of the insole, the two side zones furnishing ball and toe parts, the insole being cut out in one piece. The width of the middle zone is regulated in a general way by the length of the insole intended to be cut out. The length of the strip is not specified, but in ordinary practice it is forty-four inches. The insoles are cut from the strip in nested relation, i. e., with the heel of one between the heels and shanks of adjacent insoles, so that the part which should be stiff comes from the stiff zone and the part which should be flexible comes from a flexible zone. There is no important difference between Claim 3 and the other claims in this group, 1, 2 and 4.

Claim 12, typical of the second group, which comprises the article claims, 10, 11, 12, 17 and 18, when broken down and subjected to the disclaimer, is as follows:

"An article of manufacture comprising a sheet suitable as a blank for a multiplicity of insoles having

"(1) an elongated band of stiff, hard fibreboard, and united thereto and on each side thereof,

"(2) elongated bands of rubber impregnated, flexible sheet material consisting of felted cellulose fibres."

(Added by disclaimer):

"(3) the elongated band of fibreboard being of a width

"(a) at least equal to, but

"(b) much less than twice the length of the heel and shank portion

whereby when insoles are cut with the toes of alternate insoles directed respectively toward the opposite sides of the sheet, the heel of each of them may be cut from material between the heel and shank portions of the adjacent insoles at either side thereof."

This claim specifies the exact materials of which the zones of the strip are to be made. The stiff zone in the middle is to be made of "stiff, hard fibreboard", and the flexible zones on each side of the stiff zone are to be made of rubberized paper. The differences between Claim 12 and the other claims in this article group are unimportant.

The reason that an insole is made of two different materials, according to the evidence, is that, in women's shoes especially, the heel and shank part of the insole must be stiff and strong to keep the shoe in shape and to hold the nails when the heel is put on. This feature is more important as heels go higher and the strain on the shoe becomes greater. The forward part of the insole must be flexible so it will bend with the step of the wearer.

There is nothing new in composite insoles and nothing new is claimed. The relative importance of the functions which different parts of the insole are called upon to perform have varied during the years with the changes in women's shoes.

The plaintiff was in the business of making blanks for insoles some years before the date of the application for the patent in suit. His first blank was a three-zone strip like the patented strip, except that the middle zone was of rubberized paper and the two outside zones of fibreboard. That is, the flexible part of the strip was in the middle in one zone, instead of being split and carried in two zones on the outside. The outside zones were also narrower than in his later strips and the pattern or die was laid on so as to bring the heel and toe into the hard zones and the ball and shank in the flexible middle zone of the strip; the position of the die being reversed alternately so as to utilize both hard strips for heels and toes. In describing the exhibit of this first blank, the plaintiff referred to his purpose of using the flexible material in the middle of the strip to get a flexible ball in the insole, and of having the heel and toe ends in the hard zones so they could receive the lasting tacks and heel tacks more satisfactorily. He said nothing about getting stiffer material into the shanks, and I assume that in the then style of women's shoes it was not so necessary to use stiff shanks as later on. Cheaper shoes require stiffer shanks, and it is apparent that the cheapening of shoes and the raising of the heels, which gradually came about, was largely

responsible for the change in the make-up of the strips which required the shanks as well as the heels and sometimes the toes to be cut from the hard part of the blank.

When the shoe required an insole with a stiffer shank, one that could be used without reinforcement with a "tuck", so called, with the necessary flexible ball part and also a stiff toe-piece, the plaintiff re-arranged the zones of his first strip so that he had a wider stiff zone on one side for the heel and shank, connecting with a narrower flexible zone for the ball, and that zone connecting with a still narrower zone on the outside of stiff material for the toe. This brought stiffness where stiffness was required and flexibility where flexibility was necessary; but the toes of the insole pattern all had to point one way, resulting in a waste of material. Fewer insoles could be stamped out from one strip, as the narrower shank and heel parts would not come close together. This strip which the plaintiff developed he called a "three-lane, long-shank strip".

If no stiff toe-piece was required the outside hard band was left off, leaving a two-lane strip of which the wider hard band was for the heel and shank and the narrower more flexible band for the ball and toe-part of the sole. Cement was sometimes used, instead of tacks, to fasten the upper to the sole, so that a stiff toe-piece was not always required. In this two-lane strip the insole patterns all pointed one way and there was the same waste of material.

The next development, in order to avoid that waste and get more soles from one blank, was, in the case of the two-lane strip, to put another band of soft material on the other side of the hard band, bringing the hard band in the middle. Every other insole pattern was turned end for end in order to nest closely, resulting in more patterns being cut from one strip. This, it will be seen, made another three-lane strip, just like the first one made by the plaintiff, except that the hard band was in the middle with a soft one on each side, instead of the soft band being in the middle with a hard one on each side.

If a stiff toe-piece was desired a narrow band of the hard material was placed on the outside of the soft bands, making a five-lane strip. Samples of all these strips are in evidence, graphically illustrating these developments of the art.

Adding another soft band to the two-lane strip, bringing the hard band in the middle, and nesting the insoles to save space, is

the alleged invention covered by the patent. This is illustrated by Figure 1 of the patent. It is what the plaintiff calls his number 2 strip, Exhibit 17 in the case. Figure 5 of the patent is the same thing with a narrow band of stiff material added to each side if it is desired to have a stiff toe-piece.

All these strips, except the last one (the three-lane strip covered by the patent in suit), were made and put on the market by the plaintiff before he made the invention he claims in the patent in suit.

I have difficulty in recognizing any novel features in this patent. The practice of making up sheets of different materials to be used as blanks for cutting out articles having a composite structure is very old, especially in this particular branch of the shoe trade, where it has long been the custom to make composite insoles having heel and shank and ball and toe portions of different material, as required by the style of the shoe. Plaintiff's own No. 1 strip (Exhibit 5 in this case), which is in the prior art, had the same construction and make-up as No. 2 strip (Exhibit 17), illustrating the patent in suit, except that the hard zone in No. 2 strip is now in the middle where it is wanted for the now stiff shanks. The nesting of articles or patterns to save space is as old as articles and patterns. Plaintiff's No. 1 strip shows a nesting of the soles to be cut out, although not so close as in the patent.

Lack of novelty is shown by many previous patents, introduced in evidence by the defendant, such as Sprague No. 88,184; Ball Patent No. 1,179,493; Hart British Patent No. 6,688; the Kent Patent No. 1,303,680; and the patent to Sewall, No. 1,927,421, and others.

The two-lane strip which the plaintiff developed to meet the requirements of the trade served its purpose admirably and was a commercial success. The only objection to it was the resulting waste, referred to, due to the fact that the wide part of the soles, placed side by side in the soft part of the strip, produced fewer soles to the strip than would be the case if the positions of the soles were alternately reversed. To do that necessitated putting another soft band of material on the other side to receive the toe ends that pointed that way. Was doing that the result of inventive genius or was it an act of mechanical ingenuity?

### Conclusions of Law.

It seems to me that the plaintiff's three-lane strip with a soft band on either

side of a hard middle zone, (which is the article of the patent), and the cutting out from the strip of insoles in nested relation, (which is the method of the patent), were natural and obvious steps in the development of the business of making blanks for insoles in which the art had previously advanced to a point where all the essential elements of the patent were known, used and given to the public. Whatever was new, if anything, in the last step was clearly due to mechanical skill and cannot be reasonably ascribed to inventive genius.

It is not necessary to cite authorities to the point that mechanical ingenuity is not enough to sustain a patent. That was well put in the case of Atlantic Refining Co. v. James B. Berry Sons Co., 3 Cir., 106 F. 2d 644, 655, certiorari denied 308 U.S. 623, 60 S.Ct. 379, 84 L.Ed. 520, in which it was said: "That Lewis has shown mechanical ingenuity in adding the auxiliary steam strippers is not open to doubt, but has he displayed inventive genius? This is the crux of the case at bar in view of the fact that no exact anticipation is displayed in the prior art. His disclosures seem the result of a regular development of the art of fractionating hydrocarbons, he adding an ingenious and commercially valuable step. But, in the light of the development of the prior art, we cannot conclude that the end which Lewis achieved was the result of that incandescent and illuminating instant in which the mind grasps a hitherto undisclosed principle and with it achieves a new result whether by new tools or old. Lewis must be held not to have displayed inventive genius."

In the case at bar I find anticipation not only in other patents (Sprague notably), but by the plaintiff's own contributions to the art, in the development of which the thing patented here is an obvious step made necessary by a change in the character of the article produced.

The plaintiff's first strip produced insoles, of the kind then in demand, on exactly the same principles that his strip in the patent produces the slightly different article now in demand.

I can find no point where inventive genius intervened in the natural development of the plaintiff's product after his first strip was put on the market.

Various other objections have been urged against the plaintiff's claims, including the point that his letters patent do not carry the usual presumption of validity in view of the proceedings in the Patent Office, as shown by the file wrapper. This point may have merit, but I do not pass upon it, as I feel that even aided by the usual presumption his patent has no validity.

Judgment will be entered dismissing the complaint with costs.