902

. 26 C.C.P.A. (Patents)

### In re GILLIS et al.

#### Patent Appeal No. 4057.

Court of Customs and Patent Appeals.
April 10, 1939.

F. T. Woodward, of New York City and E. R. Nowlan, of Kearny, N. J. (C. H. Nanz, of New York City, of counsel, and H. C. Duft, of Washington, D. C., on the brief), for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting claims 2, 3, 4, 7, 16, and 17 in appellants' application for a patent for an alleged invention relating to work-hardened lead alloys containing less than 1% of calcium, and a method for making the same.

Claims 2 and 17 are illustrative of the appealed claims. They read:

"2. A work hardened lead alloy containing less than 1.0% calcium."

"17. A method of hardening a lead calcium alloy containing from .01% to .10% of calcium which comprises cold working the alloy to increase its hardness."

The references are:

Dean et al., 1,674,957, June 26, 1928;
Shoemaker, 1,813,324, July 7, 1931;
Bouton, 1,880,746, October 4, 1932;
Dean, 1,890,013, December 6, 1932;
Dean, 1,890,014, December 6, 1932;

Waterhouse: The effect of Cold-Rolling and of Heat Treatment on some Lead Alloys—The Journal of the Institute of Metals, No. 2, 1931, Vol. 46, pages 139, 140, 144, 145, 156–158, and 160.

The patent to Dean et al., No. 1,674,957, discloses a process of age-hardening a lead alloy consisting of lead and antimony or other alloy elements, such as tin. The patentees' process consists of "heating, quenching and aging the alloy."

The patent to Shoemaker relates to lead alloys consisting of lead and calcium (the calcium ranging from .1% to .4%), and small quantities of tin, mercury, and aluminum. The patentee states that the *primary hardener in his lead alloy is calcium*, and that his alloy is particularly suitable for the manufacture of various named articles. Referring to the characteristics of his alloy, the patentee states: "These characteristics comprise a degree of hardness greater than that of pure lead but not enough to prevent *working the metal by cold processes*." (Italics ours.)

The patents to Bouton and Dean (Dean Nos. 1,890,013 and 1,890,014) relate to improvements in lead-calcium alloys having less than 1% calcium. The patentees' lead-calcium alloys are produced by a process of heating, cooling, and age-hardening.

The article by Waterhouse in the Journal of the Institute of Metals treats of the "effects of cold-rolling, heat-treatment, and storage on the Brinell hardness of 14 lead alloys [lead-calcium alloys not being mentioned] containing small additions of tin, cadmium and antimony." The hard alloys were made softer and the soft alloys were made harder by the cold-working process. The increased hardness in the soft alloys, however, was but temporary and soon disappeared. Only one lead alloy (consisting of 99.5% lead and .5% antimony) was made permanently harder

(the improvement in hardness being slight) by the "cold-working" process.

The appealed claims were rejected by the Primary Examiner on the art of record, and on the ground that the appealed claims were broader than appellants' alleged invention. The examiner pointed out that the process of "cold-working" metals for the purpose of rendering them hard is old. Relative to appellants' contribution to the art, he stated: "Applicants therefore have done nothing more than make a more thorough investigation of the hardening properties along recognized lines of procedure and have therefore done nothing more than is expected of those skilled in the art. The process of cold working metals to render them hard is notoriously old. A new process is not invented for every alloy which is discovered to be amenable to that process. At most only a new article is produced. This is more apparent when it is considered that the method claims define nothing more than the obvious and necessary steps of producing the product. A work hardened alloy can be produced in no other manner than by cold working the alloy."

The examiner further stated that the patent to Shoemaker was cited for the purpose of showing "A lead alloy with calcium in the range specified by applicants * * which [it] is stated [in the patent] can be worked by cold processes."

In its decision the Board of Appeals stated, inter alia:

"It is appellant's view that the prior art knowledge with respect to lead was to the effect that no lead alloy could be *permanently hardened* by cold-working. The hardening here obtained is said to be *permanent.*

"While the Waterhouse article indicates that there was considerable self-annealing of the alloy after cold-working, it still indicates that there was some permanent increase in hardness of the softer alloys. The alloys treated had an initial hardness of from 5 to 18. After treating, the hardness range was from 8 to 11. After self-annealing, it lay between 6 and 8. It will thus be seen that, for some of the softer alloys, there was a permanent hardening.

"The patent to Shoemaker discloses a lead alloy having calcium within appellants' range and there is a suggestion in the patent that the alloy may be worked by cold processes. It is the examiner's view that this working, though not primarily intended to improve the hardness of the alloy, would inherently have that result. In an affidavit filed, it has been shown that such a result is actually not obtainable with the particular alloy of the Shoemaker patent. However, we are impressed with the examiner's view that appellants have merely discovered by a procedure which one investigating the properties of any particular metal would be expected to follow, an additional characteristic of the alloys disclosed by Dean and Bouton.

"As the examiner points out, it is well-known that the characteristics of metals may be changed by cold-working. It is also well-known that the characteristics of lead alloys could be changed by cold-working and that lead unalloyed could be so changed. Under the circumstances, we think it an obvious thing to subject the particular alloys here under consideration to this common manipulative step, to determine whether an improvement in the alloy could be thus secured. Having made this obvious test and determined its efficacy, we agree with the examiner that no patentable advance in the art has been made." (Italics ours.)

It is contended here by counsel for appellants that the board erred in stating that it appeared from the Waterhouse article that some of the alloys were permanently increased in hardness by being subjected to a "cold-working" process; that only one of the alloys tested had a permanent increase in hardness, and that only to a slight degree; and that that particular alloy, which consisted of 99.5% lead and .5% antimony, was still a very soft one and probably "unsuited for use where great tensile strength and hardness are essential." Counsel admit that "cold working is old as applied to other metals and that lead-calcium alloys, as such, were known prior to" appellants' invention; that it was old to "age-harden" lead-calcium alloys; and that "a wide variety of lead alloys have been cold worked without effecting any material improvement of permanent nature in the alloys. * * * the references fail completely to disclose or suggest that lead-calcium alloys within the range mentioned [containing less than 1% of calcium] may be given greatly increased values of hardness and tensile strength of a *permanent character merely by cold working them.*" (Italics ours.) Counsel also admit that appellants were familiar with the article by Waterhouse, and state that they cited that publication in their application for the pur-

pose of showing that "men skilled in the art believed lead and its alloys to be incapable of being permanently hardened by cold working. The publication does not refer to lead-calcium alloys and the authors do not profess to have discovered that if calcium in a given range is added to lead it will raise the recrystallization temperature of the alloy so that the hard crystal structure formed by *cold working will be permanent.*" (Italics ours.) It is urged by appellant's counsel that none of the references throw "any light upon the effect of calcium upon the *permanency of the crystal structure imparted to lead by cold working,*" and the fact that those "skilled workers [the patentees] in the art did not perceive the possibility of improving lead-calcium alloys by cold working is conclusive proof that it was not obvious to submit appellants' alloys to a cold working treatment and that appellants made a distinct advance in the art when they *discovered the effect of cold working upon these alloys.*" (Italics ours.) It is further urged by counsel that as claims covering the combined "age-hardening" and "cold-working" of lead-calcium alloys were held to be patentable over the references of record, the appealed claims are likewise patentable over those references.

The record contains an affidavit of one of the joint applicants, Clarence T. Prendergast, from which it appears that the alloys disclosed in the Shoemaker patent "are not susceptible to cold work-hardening."

It appears from the record that claims 18 to 23, inclusive, in appellants' application were allowed by the Primary Examiner. Those claims covered *work-hardened* and *age-hardened* lead-calcium alloys, and a method of producing them. Each of those claims was expressly limited, as stated in claim 18, to an alloy having the character of *"permanent hardness* induced by the combined action of said work-hardening and age-hardening." (Italics ours.)

The gist of the argument of counsel for appellants is that the prior art does not disclose nor suggest that a *lead-calcium al-loy* can be *permanently hardened by a process of "cold-working,"* and that as appellants were the first to discover that such process would produce a *new alloy* having the quality of *permanent hardness* they are entitled to a patent for their contribution to the art. (Italics ours.)

The argument presented by counsel for appellants is plausible. Unfortunately, however, the appealed claims, "the measure" of appellants' alleged invention here on appeal, do *not* define a lead-calcium alloy having the character or quality of *permanent hardness.*

The Waterhouse article discloses that the cold-working of some lead alloys would produce a temporary hardness, and we find nothing in the appealed claims to indicate that appellants have done anything more than to apply an old process (cold-working) to a lead-calcium alloy without obtaining a substantially different result from that disclosed in the Waterhouse article.

Reliance is placed here by counsel for appellants upon the disclosure in appellants' specification.

Appellants' specification discloses that a lead-calcium alloy may be permanently hardened by subjecting it to the "cold-working" process. However, the specification is not "the measure" of appellants' invention, and the limitations contained therein cannot be read into the appealed claims for the purpose of avoiding the prior art. In re Kirchbaum, 39 F.2d 280, 17 C.C.P.A., Patents, 979; In re Stern, 40 F.2d 1000, 17 C.C.P.A., Patents, 1234; In re Wait, 83 F.2d 696, 23 C.C.P.A., Patents, 1172; In re Crowell, 84 F.2d 206, 23 C.C.P.A., Patents, 1246.

So far as the appealed claims (to which our decision is limited) are concerned, it does not appear that appellants have done anything more than to subject an old alloy to an old process and obtain an old result.

For the reasons stated, the decision is affirmed.

Affirmed.