## DE CEW v. UNION BAG & PAPER CORPORATION.
### Civil Action No. 108.

District Court, D. New Jersey.

Aug. 16, 1944.

Bartlett, Eyre, Keel & Weymouth, of New York City, for plaintiff.

Gifford, Scull & Burgess, of New York City, for defendant.

SMITH, District Judge.

This is a suit under the patent laws for the infringement of two patents of which the plaintiff is admittedly the owner. The one, No. 1,558,845, hereinafter referred to as '845, issued on an application filed by the plaintiff on June 7, 1924; the other No. 1,589,947, hereinafter referred to as '947, issued on an application filed by the plaintiff on September 19, 1925. The defendant denies infringement and challenges the validity of the patents.

The patents pertain generally to the manufacture of paper and relate particularly to improvements in the method of sizing the cellulose fibers of which papers are made. The claims of the respective patents are limited to the successive mechanical steps of the methods therein defined; the chemical process is concededly old. The present suit is directed to an alleged infringing method practiced by the defendant in the manufacture of kraft papers and liners.

### State of The Art

An extensive recital of the history of the paper industry seems unnecessary, but it should be noted that the progress of the industry has been marked by numerous inventions, discoveries, and technical improvements. The patents in suit must be examined and appraised in the light of these advances, and, therefore, a general knowledge of the art of paper manufacture, and particularly that branch thereof to which the said patents relate, is necessary, not only to the proper interpretation of the claims, but also to the adequate understanding of the issues here presented. It is with this in mind that we undertake an outline of the state of the art, omitting, of course, the technical detail.

Papers are made of cellulose fibers derived from many sources, e. g., wood, jute, hemp, straw, flax, rags, etc. The several methods of manufacture, although they may differ in technique, according to the nature of the raw material and the quality of the paper, are essentially the same. Kraft papers, such as those manufactured by the defendant, are made of cellulose fibers derived from wood, and the art of manufacturing such papers, as hereinafter outlined, is apposite here and illustrative of the methods in common use.

The wood, cleaned and suitably prepared, is cooked in a solution of caustic alkali and reduced to pulp; the ligneous constituents of the wood are thus removed, leaving a soft, wet, and slightly cohering mass of insoluble cellulose fibers. This fibrous material, having been thus extracted and prepared, is converted into paper in three successive operations, identified in the industry as "beating," "refining," and "felting." These operations have remained essentially the same for many years although there have been many improvements in the apparatus used in their performance.

The pulp, brought to a predetermined fluidity and consistency by the introduction of water, is milled in a hollander,[1] in which the pulp is circulated between a bedplate and a rotating roll, each of which is equipped with blunt metal bars or knives. This operation imparts to the fibrous material the physical properties essential to the formation of the paper; the individual fibers are isolated and suspended, shortened, and hydrated, and the stock becomes gelatinous. This stock, after having been thus treated and prepared, is then refined in a jordan,[2] in which the stock passes between the inner periphery of a conical shell and the outer periphery of a rotating plug, each of which is equipped with blunt metal bars or knives. This operation, as the term "refine" imports, improves the physical qualities imparted to the fibrous material in the initial operation, and, in addition, "brooms" or "fibrillates" the fibers.

These successive operations, except for the apparatus in which they are performed, are similar, and in each of them the fibers are subjected to a "beating action" which differs only in degree. This "beating action" imparts to the fibers certain physical properties which not only contribute to the formation of the paper but also enhance its quality and strength. It necessarily follows that the "beating action," indispensable in the manufacture of paper, is peculiarly essential in the manufacture of kraft papers.

It should be observed that the "beating action" of the hollander and the "beating action" of the jordan are basically indistinguishable in practice, principle, or result. The hollander and the jordan, designed to perform identical functions, are similar in their essential structural elements, and differ only in their form of construction; the jordan, which was invented and introduced many years after the hollander, in 1858, may be utilized as a hollander, and in many modern paper mills has replaced it.

The final operation, the formation of the paper, is continuous and consists of three successive steps which are carried out on the paper machine, or Fourdrinier. The stock, previously prepared in the manner described, and diluted with water, is conducted to the paper machine, and the paper is formed in the following manner: First, the stock is conducted onto an endless belt of wire cloth on which the fibers are felted and the excess water removed; second, the moist sheet thus formed is passed through a series of press rolls which set the fibers and compact the sheet; and third, the sheet is passed through a series of heated drying rolls which dry and finish the paper. A cylinder machine is frequently used instead of a Fourdrinier, but the operative steps of the final operation are substantially the same.

The modern paper mill is so constructed, and the equipment is so arranged, as to permit either an intermittent or continuous flow of stock from the hollander to the paper machine. There is between the hollander and the jordan a storage chest, hereinafter referred to as the "beater chest"; there is between the jordan and the paper machine a storage chest, hereinafter referred to as the "machine chest." These chests are equipped with appropriate apparatus to control the flow of stock. It seems unnecessary for our present purposes to describe the construction and operation of this equipment, but it is necessary to note its relative location.

Sizing, the art to which the patents in

---

[1] This apparatus is frequently referred to as the "engine" or "beater."

[2] This apparatus is frequently referred to as the "refiner."

suit relate, overcomes the absorptive quality of the fibers and imparts to the finished paper its water resistant property. There are two processes in common use: The one, "engine sizing," which is carried out in the stock as a concomitant operation in the preparation of the stock, and the other, "tub sizing," which is carried out on the paper after the formation of the sheet. The former differs from the latter in operative principle, but this difference is not substantial.

The "engine sizing" process, as hereinabove stated, is carried out as a concomitant operation in the preparation of the stock. The chemical ingredients, aluminum sulphate and rosin emulsion, are introduced as the stock is prepared, and in the following manner: First, the rosin emulsion is introduced into the stock at the hollander, where it is thoroughly mixed with the stock to insure uniformity; second, the aluminum sulphate, either dry or in solution, is introduced into the stock at the hollander, but after the "beating action" has been completed and the beater roll has been raised. The stock thus treated by the addition of the chemical ingredients is thoroughly agitated in either the beater or a separate mixing hollander; if the beater is used the "roll is raised" to avoid damage to the size, the coagulum or precipitate, produced by the chemical reaction between the ingredients.

The sizing of the paper, by the practice of this method, is accomplished by the coagulation or precipitation of a film of rosin size on the *fibers suspended in the stock.* The individual fibers are thus coated with a water repellent size, which is rendered permanent in the final drying operation, imparting a finish to the sheet. The coagulum or precipitate is an irreversible gel[3] of aluminum resinate and free rosin produced by the chemical reaction between aluminum sulphate[4] (the precipitating agent) and rosin emulsion[5] (the sizing agent); this coagulum or precipitate, because of its nature, is susceptible of impairment by the "beating action" of either the hollander or the jordan.

The introduction of the rosin emulsion before the aluminum sulphate in the manner described is the common practice in the industry, but the introduction of the aluminum sulphate before the rosin emulsion is not unknown. The introduction of the aluminum sulphate before the rosin emulsion is frequently necessary to counteract the effects of hard water; the presence of calium carbonate and other substances in hard water has been found to be injurious to the size.

The "tub sizing" process, as hereinabove stated, is carried out after the sheet has been formed. The chemical ingredients are introduced at the size tub or press through which the formed sheet is passed. The sizing of the paper by the practice of this method is accomplished by the deposit of a film of rosin size on the surface of the sheet. The surface of the paper, as distinguished from the individual fibers of which it is made, is coated with a water repellent size which is rendered permanent in the final drying operation. We note here, for the purpose of emphasis, that this process, which is the older of the two, is carried out after the "beating action" has been completed.

### Patents in Suit

The purported inventions of the respective patents are directed to the solution of the same problem, to wit, the damage to the coagulum or precipitate occasioned by the "beating action" of the jordan. This problem is stated in the specifications of the patents in identic language.[6] The invention of Patent No. '845 is generically defined in claim 1 thereof as follows: "The method of sizing paper which consists in *withholding the precipitation of the rosin until after the beating action of the jordan engine is complete.*" The invention of Patent No. '947 is generically defined in claim 3 thereof as follows: "A method of sizing paper which consists in *coagulating the size in the stock after said stock has passed through the jordan.*" (Emphasis by the Court.)

---

[3] The chemical composition of the gel has not been definitely established but it is assumed that it is a mixed coagulum of aluminum resinate and rosin.

[4] Alum.

[5] An emulsion or soap prepared by the saponification of rosin.

[6] The coagulated sizing material is in a very highly dispersed and hydrated condition when it is freshly precipitated, but as it passes through the jordan in the presence of excess of sulphate of alumina, the violent beating action has a strong dehydrating action on the alumina and rosin hydrates. Moreover, the sizing material that is precipitated upon the surface of the fibers will be scraped off and left as a filling material between the fibers.

## Double Patenting

 It is obvious upon a mere reading of these claims that the inventions therein defined are identical. The claims are co-extensive, and are indistinguishable except in their descriptive language. The claims cover the same method, and each of them is sufficiently broad to embrace all of the adaptations recommended by the patentee: The introduction of the rosin emulsion into the stock at the beater, followed by the introduction of the aluminum sulphate after the stock has passed through the jordan; the introduction of the aluminum sulphate into the stock at the beater, followed by the introduction of the rosin emulsion after the stock has passed through the jordan; and, the introduction of both ingredients into the stock after it has passed through the jordan. The novel principle common to both claims—and the only one to which the patentee asserts a claim of invention—is the coagulation or precipitation of "the size in the stock" after the "beating action of the jordan engine is complete." The conclusion that the inventions are identical seems inescapable.

It is well established that where, as here, two patents, issued to the same patentee, embrace inventions which are patentably indistinguishable, the second patent is void. Suffolk Co. v. Hayden, 3 Wall. 315, 18 L. Ed. 76; James v. Campbell, 104 U.S. 356, 382, 26 L.Ed. 786; Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121; Lion Fastener v. Hookless Fastener Co., 3 Cir., 72 F.2d 985; Oliver-Sherwood Co. v. Patterson-Ballagh Corp., 9 Cir., 95 F.2d 70, certiorari denied 304 U.S. 573, 58 S.Ct. 1042, 82 L.Ed. 1537. Accord: In re Gollmar, 67 F.2d 907, 21 C.C.P.A., Patents, 749; In re Barge, 96 F.2d 314, 25 C.C.P.A., Patents, 1058; In re Sherman, 121 F.2d 527, 28 C.C.P.A., Patents, 1329; In re Christmann, 128 F.2d 596, 29 C.C.P.A., Patents, 1037; In re Copeman, Cust. & Pat.App., 135 F.2d 349. The validity of the later patent may be sustained only if the invention therein defined is essentially different from that comprehended in the earlier patent. Ibid. It follows that under the settled law Patent No. '947 is void.

## Anticipation

 The validity of the patents in suit is challenged on the ground of anticipation, or absence of novelty. The defendant, in support of this defense, cites numerous patents and publications of the prior art, but the necessary limits of this opinion will not permit a comprehensive discussion of all of them. There are but eight of the cited references which are apposite: Weygang Patent, British No. 7904; Capazza Patent, British No. 5776; Irving-McNeil Patent, U.S. No. 60635; Lamb Patent, British No. 3306; Munroe Patent, U.S. 1,335,909; Beltzer, The Sizing of Paper, Pulp and Paper Magazine (August 14, 1924); Klemm, Handbuch der Papier Kunde (1904); The Sizing of Paper, The Paper Mill (February 13, 1904). These references are hereinafter considered in the order of their relative importance.

The patent to Weygang, granted on July 12, 1886, covers "Improvements in Waterproofing and Sizing Paper and such like Material," and embraces alternative methods. The one conforms to the conventional practice hereinabove described; the other conforms to the method defined in the patents in suit. It is necessary to weigh only the latter.

This patent, after describing the conventional practice, defines the alternative practice in the following language: "Instead of completing the entire sizing operation in the beating engine [7] as described" (the conventional practice) "similar results are produced by passing the fibrous pulp after the size has been added and thoroughly mixed in the said beating engine *into another suitable apparatus* [8] fitted with mixing arms or other contrivance capable of mixing the pulp without much friction and *adding the alum or other precipitating solution to the pulp in this apparatus.*" The language of this patent is somewhat ambiguous, but its pertinent disclosure is sufficiently clear and unmistakable.

It is significant that the stated object of this practice, in the language of the patentee, is "to avoid or lessen the effects of the friction and agitation of the beating roll whilst and sizing matter is being and after it is precipitated." It seems reasonably apparent that Weygang not only perceived the problem but also conceived that its solution lay in withholding the precipitation or coagulation of the size until after the "beating action."

The patent to Weygang is, in our opinion, a complete anticipation of the claims in suit. If its disclosures are accorded

---

[7] Hollander.

[8] Mixing hollander.

their full significance, it is evident that there is no critical distinction between the practice of Weygang and the method of the present claims. Weygang teaches, as does DeCew, the coagulation or precipitation of the size in the stock after the beating operation, and for the same purpose, to wit, to avoid damage to the coagulum or precipitate occasioned by the "beating action." The only difference between the disclosure of Weygang and the claims of DeCew is in their descriptive language, and the plaintiff makes the most of this.

■ The distinctions urged by the plaintiff, in a voluminous brief, are hypercritical, and are predicated entirely upon the inapt exposition by Weygang of his method and his injudicious recommendations of sizing formulas. The relevancy of the Weygang patent, however, lies not in its recommendations of formulas but in its disclosure of the methods to which it is particularly directed. Cf. Wood-Paper Patent, 23 Wall. 566, 606, 23 L.Ed. 31; Minerals Separation North American Corporation v. Magma Co., 280 U.S. 400, 50 S.Ct. 185, 74 L.Ed. 511. This disclosure, measured by commonly accepted requirements,[9] is sufficient to negative novelty.

■ The contention that Weygang neither understood the problem nor appreciated the advantages of his invention is not supported by the evidence; but, even if it were, the disclosure of his patent must, nevertheless, be accorded its full import. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669; Ranco, Inc., v. Gwynn, 6 Cir., 128 F.2d 437. The further contention that the Weygang patent "was permitted to lapse for nonpayment of the taxes," although supported by the evidence, is without merit. The nonpayment of the taxes and the consequent lapse of the patent does not affect the relevancy of its pertinent disclosure. Sirocco Engineering Co. v. B. F. Sturtevant Co., 2 Cir., 220 F. 137, certiorari denied 238 U.S. 636, 35 S.Ct. 939, 59 L.Ed. 1500.

The patent to Capazza, granted December 16, 1899, is directed to "A New or Improved Process of Charging and Sizing Paper," and discloses, in addition to the charging process, a sizing process identical with the method of the claims in suit. These processes, as carried out under the instructions of the patent, are concomitant. The pertinent disclosure follows:

"The following method is therefore preferable: It consists in employing the paste or pulp solution in the refining cell" (jordan) "or in the receptacle placed at the head of the machine," (machine chest) "* * * and in passing through the same a current of carbonic acid gas * * *.

"The quantity of carbonic gas to be injected ought to be such that the pulp solution is neutralized. *As soon as this result is obtained the necessary quantity of resinous soap required for the sizing of the paper is added to the solution and the injection of carbonic acid gas is continued until a sufficient amount of the resin is set free to insure the proper sizing. If need be a little sulphate of aluminum or other suitable acid reagent may be added."* (Emphasis by the Court.)

The patent, after thus describing the process, recommends that:

"The proportion of resinous soap which requires to be added to the pulp solution is approximately equal to that usually employed in the art and varies with the degree of sizing required. The proportional amount of aluminum sulphate to be added to the pulp is the same as that employed for ordinary pulps."

The quoted disclosure, which is susceptible of but one interpretation, teaches alternative methods: Either the introduction of the rosin size and the aluminum sulphate into the jordan, or the introduction of the rosin size and the aluminum sulphate into the machine chest. The latter practice conforms to the method of the claims in suit and, if followed, will effect a precipitation or coagulation of the size in the stock *after it has passed through the jordan;* this is substantially the only teaching of the said claims. This adaptation of the Capazza process is identical with the

9 Skelly Oil Co. v. Universal Oil Products Co., 3 Cir., 31 F.2d 427; Wisconsin Alumni R. Foundation v. George A. Breon & Co., 8 Cir., 85 F.2d 166, certiorari denied 299 U.S. 598, 57 S.Ct. 191, 81 L. Ed. 441; American Safety Table Co. v. Singer Sewing Machine Co., 3 Cir., 95 F. 2d 543, certiorari denied 305 U.S. 622, 59 S.Ct. 82, 83 L.Ed. 397; Southern Phosphate Corp. v. Phosphate Recovery Corp., 3 Cir., 102 F.2d 801; Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 124 F.2d 986.

method of claim 1 of '947, a specific claim which has been held invalid.[10]

The patent to Irving-McNeil, granted on December 18, 1866, is directed to an "Improvement in the Manufacture of Water and Fire-Proof Paper," and embodies a process similar in its essential steps to the method of the claims in suit. The specification directs that the raw material, suitably prepared, be subjected to the following treatment: "From thence" (the boiler or digestor) "the mass is passed to the pulp engines, where, when reduced to what is called half pulp, it is saturated with a *solution of gum catechu and borax, in addition to the usual rosin sizing*. In passing over the paper machine, and before entering the second press rolls, the paper is passed through *a solution of alum and borax, which closes up the surface, making the paper nearly water and fireproof*." (Emphasis by the Court.) This practice, as thus described, is within the purview of the claims in suit and is substantially identical with the method of claim 3[11] of '845, a specific claim.

The plaintiff, in an endeavor to support a tenuous distinction between the claims in suit and the disclosure of the Irving-McNeil patent, relies upon his interpretation of the term "usual rosin sizing," as used in the Irving-McNeil patent. It is urged that the "usual rosin sizing," referred to therein, is not rosin size emulsion but the resultant coagulum or precipitate produced by the reaction of rosin size emulsion and aluminum sulphate. There is nothing, in either the language of the Irving-McNeil patent or the inferences of which it is reasonably susceptible, to support this narrow interpretation. This construction does violence to the clear and unmistakable teaching of the patent.

The Irving-McNeil patent is attacked on the ground that the process therein described is impracticable. It must be conceded that the process is neither efficient nor economical, but there is nothing in the testimony from which it may be found or inferred that it is so impracticable as to be useless. The only deficiency (suggested by the plaintiff's expert) may be easily corrected by the introduction of the alum "just before the fibers go to the paper machine"; this simple correction is one that would readily occur to the person possessed of the common knowledge and skill of the art.

It is well settled that a paper patent may negative otherwise patentable novelty where, as here, it sufficiently discloses the principles of the alleged invention, and the objections to impracticability can be obviated by mere mechanical skill. Walker on Patents, Deller's Edition, 272; Pickering v. McCullough, 104 U.S. 310, 319, 26 L.Ed. 749; General Electric Co. **v.** Philadelphia Electric & Mfg. Co., 2 Cir., 232 F. 722, 726; Rid-Jid Products v. Rich Pump & Ladder Co., 6 Cir., 103 F.2d 574, 578; R. J. Funkhouser & Co. v. Fiske & Co., 2 Cir., 106 F.2d 679, 680; Atlantic Refining Co. v. James B. Berry Sons Co., 2 Cir., 106 F.2d 644, 654, certiorari denied 308 U.S. 623, 60 S.Ct. 379, 84 L.Ed. 520; E. J. Brooks Co. v. Klein, 3 Cir., 114 F.2d 955, 957. This attack must, therefore, fail.

It should be noted that the suggested correction is the specific improvement over Irving-McNeil, embodied in claim 3 of '845, from which the quotation was taken. It cannot be seriously argued that this slight improvement, considered in the light of the state of the art, required anything more than the mechanical ingenuity expected of the skilled technician.

The relevancy of the Irving-McNeil disclosure is challenged on the ground that it pertains only to "tub sizing" and not to "engine sizing." This limitation is not embodied in the disclosure, but the plaintiff's argument suggests that it must be inferred. However, assuming that the disclosure must be so construed, the challenge is without merit because it presupposes that the patents in suit are restricted to "engine sizing." The proper construction of the unambiguous language of the claims, as the measure of the purported invention, will not support the presupposition; there is no restriction embodied in the claims, and they seem to be sufficiently broad to embrace both "tub sizing" and "engine sizing."

The claims, as the measure of the invention, not only define the limits of the patent monopoly but also determine the

---

10 Process Engineers v. Container Corporation, 7 Cir., 70 F.2d 487, certiorari denied 293 U.S. 588, 55 S.Ct. 102, 79 L.Ed. 683.

11 "The method of producing with paper pulp an undehydrated precipitate of rosin and alumina which consists in adding the alum to the fibers just before the fibers go to the paper machine."

scope of the art, and these boundaries, established by the patentee, may be neither extended nor shortened to meet the exigency of a particular situation. The claims are equally definitive of the field of infringement and the field of the prior art. Jackson Fence Co. v. Peerless Wire Fence Co., 6 Cir., 228 F. 691; Perfect Circle Co. v. Hastings Mfg. Co., 6 Cir., 88 F.2d 813. The claims, although frequently interpreted in the light of the specifications, may not be either expanded or contracted by the specifications, Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U.S. 399, 410, 25 S.Ct. 697, 49 L.Ed. 1100; White v. Dunbar, 119 U.S. 47, 51, 52, 7 S.Ct. 72, 30 L.Ed. 303; Cf. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122; the limitations contained in the specifications may not be read into the claims for the purpose of avoiding the prior art. In re Henschell, 90 F.2d 357, 24 C. C. P. A., Patents, 1287; In re Kuhrts, 95 F.2d 325, 25 C. C. P. A., Patents, 1043; In re Gillis, 102 F.2d 902, 26 C. C. P. A., Patents, 1086; In re Unger, 104 F.2d 386, 26 C. C. P. A., Patents, 1317. "The exactitude which the (plaintiff) now claims must be characteristic of a prior publication before it may be held to anticipate or limit the inventive field, must likewise be characteristic of the patented disclosure. If not, the claims are too broad and so, under familiar rules, invalid." Hamilton Laboratories v. Massengill, D.C., 111 F.2d 584, 587, certiorari denied 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444.

The patent to Lamb, granted June 9, 1863, covers "Improvements in the Manufacture of Tissue Paper for Transferring Patterns and Designs." The invention, following the language of the patent, "consists in combining the size with the pulp in the ordinary rag engines" [12] (conventional practice) " * * *, or in sizing the paper in its progress through the paper making machines." The latter practice, which is similar to the Irving-McNeil process, will accomplish the coagulation or precipitation of the size in the stock as it passes through the paper machine.

The patent to Lamb is undoubtedly open to the criticisms urged against the Irving-McNeil patent, but it seems unnecessary to discuss them because they must be similarly answered. The relevancy of this patent, however, is assailed on the further ground that its disclosure relates to tallow size and not to rosin size. This objection is untenable. The patent covers a sizing process which is clearly not limited to the use of the materials recommended. The patentee asserts, in unmistakable language, that "Other substances possessing the same or similar properties may be used."

The patent to Munroe, granted on April 6, 1920, is directed to "Improvements in Thermo-Insulation Material and Processes of Producing the Same." The "thermo-insulation material" of this patent, which is defined in claims 6 to 9 thereof, inclusive, consists of nothing more than a plurality of sheets of kraft paper of low grade. This product, according to the instructions of the patent, and particularly claim 2 thereof, is manufactured by the following process: "The process of producing *waterproof* heat insulating blocks of *fibrous material* which consists in providing a solution of *cellulose fibers* and water; *treating said solution with a waterproofing material to coat said fibers;* heating said sheets in a moist atmosphere whereby they are dried progressively from the interior outwardly; and fastening a plurality of said sheets together to form a block, substantially as described." (Emphasis by the Court.) The patent clearly recognizes as old the conventional practices of the art hereinabove discussed.

The pertinency of this patent lies in its disclosure of a method of sizing ("waterproofing") paper. This method is disclosed in the following instructions of the specifications: *"After the material is of a desired size and consistency"* (the treatment of the fibers and the preparation of stock in accordance with conventional practice) "a proportion of ordinary rosin size not exceeding say 10% is run in and the material is thoroughly mixed. Aluminum sulfate is then run in and thoroughly mixed also, *which precipitates free rosin and aluminum resinate on each individual fiber.* The material is then introduced into the felting machine, where it is mixed with water to approximately the proportions above given, and felted into sheets, * * *." (Emphasis by the Court.) This is substantially the method of the claims in suit, to wit, the precipitation or coagulation of the size in the stock after the fibrous material has been milled and re-

---

[12] Hollander.

fined, and before it flows onto the paper machine.

It clearly appears, not only from the patents herein considered, but also from the publications of the prior art, that the practice of withholding the precipitation or coagulation of the size until after the beating action is complete, was old..

Beltzer, The Sizing of Paper, published in April of 1924, disclosed the practice. This publication recommended, at page 843: "* * *, the sizing operation should not be carried out in the beating engine, * * *. *After the beating is complete* the stock should be transferred to a mixing engine in which it is cooled and then sized, colored, etc." And, at page 844: "If no mixing engine is available, the size should be added only *after the beating is complete* and the roll has been raised; * * *." (Emphasis by the Court.) The claims in suit are distinguishable from these recommendations only in their descriptive language.

Klemm, Handbuch der Papier Kunde, published in 1904, contains the following disclosure: "Thereupon thorough admixture of the pulp fibers with the size must be accomplished. In most mills this is done in the hollanders even during the beating, but sometimes only *after the completed beating of the fibers is it done in separate mixing hollanders,* which no longer act mechanically on the fibers" (beating action), "being provided only with propelling mechanisms, which impart to the stock the most rapid movement possible." (Emphasis by the Court.) It may be inferred from this disclosure that it was common practice, as early as 1904, to withhold the precipitation or coagulation of the rosin size until after the "beating action" was completed.

The "Sizing of Paper," published in 1904, contains the following pertinent disclosure: "By continuous hard beating the strength of the rosin size is frequently impaired. Papers made from hard stock require a hard beating for several hours, and consequently the stuff becomes heated— sometimes up to 70 degrees C.—too hot to be touched by hand. In case such stuff has been well sized at the start, (one) may be sure that the sizing shows deterioration. It is therefore best to nearly finish the beating before adding the size, to empty part of the pulp into the stuff box, adding the sizing after cooling the same with water." This disclosure is not free from ambiguity, but, interpreted in the light of the state of the art, it would seem to disclose to the skilled technician not only the problem but also the simple remedy adapted to its solution.

■ It is contended by the plaintiff that the cited references are insufficient to sustain the defense of anticipation because of the absence of any disclosure of the concept upon which his present claim to invention rests, to wit, "withholding the precipitation of the rosin until after the *beating action* of the *jordan* engine is complete." (Emphasis by the Court.) The plaintiff's argument, as distinguished from the contention, stresses not the absence of the concept in the earlier disclosures but the absence of the term "jordan" therein. It is evident, however, upon analysis of the argument, that the only distinction which he successfully draws, lies in language and not in substance. This distinction will neither enhance the claim to invention nor detract from the sufficiency of the cited references. The significance of prior art references is in their substance and not in their language.

The very essence of the purported invention resides in the operative principle of withholding the coagulation or precipitation of the rosin size until after the "beating action" peculiar to the beating operation. The cited references unmistakably disclose this concept. The hollander and the jordan are essentially "beaters," and perform identical functions in the manufacture of paper; the "beating action" peculiar to the one is equally peculiar to the other. It is obvious that if the coagulation or precipitation of the rosin size must be withheld until after the "beating action" of the hollander, it must likewise be withheld until after the "beating action" of the jordan.

■ The common knowledge and skill of the art is determinative of the sufficiency of anticipatory references. If the fictitious person of the patent law, the person possessed of the common knowledge and skill of the art, can practice the purported invention by resort to the cited references and without resort to the patent in suit, the cited references are sufficient to negative novelty. (See cases cited in note 9.) It is the opinion of the Court that each of the references hereinabove discussed, measured by this stand-

ard, is sufficient to sustain the defense of anticipation.

## Public Use

■ The purported invention, and particularly the adaptation thereof defined in claim 3 of '845, had been in public use in the mill of the Falulah Paper Company for more than two years prior to the plaintiff's applications for the patents. It seems unnecessary to recount the successive steps of the practice of the said mill, except to note that thereunder the precipitation or coagulation of the size was effected, "after the beating action of the jordan engine" was "complete." This was accomplished in the following manner: first, the rosin size emulsion was introduced in the stock in a separate mixer placed ahead of the jordan; and second, the aluminum sulphate was introduced into the stock as it passed through the discharge line which conducted it from the jordan to the machine chest. In this practice the rosin size was precipitated or coagulated "in the stock" as it flowed to the paper machine. This practice substantially conforms to the method of the claims in suit and is identical with the adaptation defined in claim 3 of '845. The patents in suit are, therefore, void. R.S. § 4886, 35 U.S.C.A. § 31 (Act of July 8, 1870 as amended), 35 U.S.C.A. 31; Brush v. Condit, 132 U.S. 39, 10 S.Ct. 1, 33 L. Ed. 251; Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049; Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071; Twyman v. Radiant Glass Co., 8 Cir., 56 F.2d 119; Midland Flour Milling Co. v. Bobbitt, 8 Cir., 70 F.2d 416.

## Lack of Invention

■ The patents in suit, if the construction urged by the plaintiff is adopted, cover "an improvement" on an art which has been in common use in the paper industry for more than a century.[13] The purported invention and the adaptations thereof, as defined in the respective claims of the patents, rest entirely upon a single operative principle, to wit, the precipitation or coagulation of the rosin size in the stock "after the beating action of the jordan is complete"; except for this element, the purported invention is admittedly old. It may be conceded, at least for the purpose of our present discussion

and consideration, that this simple modification of the earlier practice, hereinabove described, is "new and useful," but the more important issue presented for determination here, as in all patent cases, is whether or not the "improvement" sufficiently transcends the common knowledge and skill of the art to achieve the level of invention. R.S. § 4886, 35 U.S.C.A. § 31; Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502; Berlin Mills Co. v. Procter & Gamble Co., 254 U.S. 156, 41 S.Ct. 75, 65 L. Ed. 196; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U. S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Hansen v. Slick, 3 Cir., 230 F. 627; Atlantic Refining Co. v. James B. Berry Sons Co., 3 Cir., 106 F.2d 644, certiorari denied 308 U.S. 623, 60 S.Ct. 379, 84 L.Ed. 520; Electric Vacuum Cleaner Co. v. P. A. Geier Co., 6 Cir., 118 F.2d 221; Emmett v. Metals Processing Corp., 9 Cir., 118 F.2d 796; Seiberling Rubber Co. v. I. T. S. Co., 6 Cir., 134 F.2d 871, certiorari denied 320 U.S. 747, 64 S.Ct. 50, and other cases hereinafter cited. An art or any improvement thereon which fails to meet this requirement, although it meet all others, is not patentable. Ibid.

■ The issue of invention, which is obviously relative, is often difficult of satisfactory decision, especially where, as here, the purported invention relates to a slight improvement on an old art. The nature of the issue is such that its decision requires recourse to commonly accepted, but negative criteria, which, of necessity, lack definiteness. The disclosure of the disputed patent must be appraised in the light of the prior art, considered in its entirety, and if, upon such an appraisal, it fails to surpass the common knowledge and skill of the art, it is not invention. Berlin Mills Co. v. Procter & Gamble Co., Saranac Automatic Machine Corp. v. Wirebounds Patents Co., and Atlantic Refining Co. v. James B. Berry Sons, all supra; Ft. Pitt Supply Co. v. Ireland & Matthews Mfg. Co., 6 Cir., 232 F. 871; Addressograph-Multigraph Corp. v. Staudt, 2 Cir., 124 F.2d 672; Triumph Explosives v. Kilgore Mfg. Co., 4 Cir., 128 F.2d 444, certiorari denied Faber v. Triumph Explo-

---

[13] It would appear from the cited references that the practice of "engine sizing" was conceived and introduced by Illig in 1807, if not earlier.

sives, 317 U.S. 660, 63 S.Ct. 59, 87 L.Ed. 530; Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, certiorari denied 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524. Even though the cited references of prior art may fall far short of complete anticipation, they may be sufficient, when thus considered, to negative invention. Ibid. Strict application of this test of invention is necessary "lest * * * the heavy hand of tribute be laid on each slight technological advance in an art." Cuno Engineering Corp. v. Automatic Devices Corp., supra, 314 U.S. at page 92, 62 S. Ct. at page 41, 86 L.Ed. 58.

▆▆▆ The disclosures of the patents in suit, appraised in the light of the prior art and measured by the commonly accepted criteria, are not patentable inventions. These disclosures embrace nothing more than simple and obvious modifications of earlier sizing methods, consistent with the progress of the paper industry. These modifications required only the application of the knowledge and skill of the art to the solution of a simple problem, which recurred upon the introduction of new and improved apparatus, the jordan. The resultant advance over the prior art, if any, is not patentable invention, but is the expected progress in the development of the paper industry. Atlantic Works v. Brady, Hansen v. Slick, Atlantic Refining Co. v. James B. Berry Sons· Co., all supra.

It was common practice in the paper industry, even prior to the advent and use of the jordan, to withhold coagulation or precipitation of the rosin size until after the "beating action" peculiar to the beating operation as carried out in the hollander. This was accomplished under the method hereinabove outlined by the introduction of the rosin size emulsion into the stock at the hollander, followed by the introduction of the aluminum sulphate into the stock, likewise at the hollander, but "after the beater roll had been raised"; thus, the coagulation or precipitation of the rosin size was withheld until after the "beating action." The hollander was utilized as a mixing apparatus in this practice.

It is apparent from the cited references of prior art that the technicians who preceded the plaintiff perceived the problem, to wit, the impairment of the coagulum or precipitate by the "beating action" and, without asserting any claim to invention,

conceived that its solution lay in this simple and obvious expedient of delaying the coagulation or precipitation of the rosin size until after the "beating action."

The jordan and the hollander, as hereinabove stated, are similar in their structural elements and perform identical functions in the manufacture of paper. The advent of the jordan in 1858, followed by its wide use in the paper industry, did not result in a new problem but in the recurrence of an old problem peculiar to the 'beating action" of both apparatuses. The adaptation of earlier sizing methods to the solution of this recurring problem, a course plainly indicated by the prior art, required nothing more than the expected skill and ingenuity of the experienced technician. The patent laws do not protect such achievement.

The statement of Judge Simons in the case of Murray-Ohio Mfg. Co. v. E. C. Brown Co., 6 Cir., 124 F.2d 426, 428, if paraphrased to meet the facts of this case, is a complete answer to the plaintiff's claim to invention. The paraphrased statement reads as follows: "In the present state of the mechanical arts it is difficult, if, indeed, not impossible, to sense invention in this expedient. It would seem to be the obvious response of routine mechanical skill to the need once that had been perceived. Even were we unaware of the higher standard now demanded for invention by the decisions of the Supreme Court in recent years, * * *, it would seem to be obvious that" (withholding precipitation of the rosin until after the beating action of the jordan engine is complete) "would be within the compass of expected mechanical skill."

It is our firm conviction that the patents in suit are invalid because of the complete absence of patentable invention. The classic statement of Mr. Justice Bradley, in the case of Atlantic Works v. Brady, supra, 107 U.S. at page 199, 2 S. Ct. at page 230, 27 L.Ed. 438, is apposite here, but the limits of this opinion will not permit its quotation.

### Commercial Success

▆▆▆ The claim to invention is supported by proof of the commercial success which followed the favorable reception of the patents by several paper manufacturers who accepted licenses thereunder. It appears, however, that under the license agreements, copies of which are in evi-

dence, these manufacturers acquired the right to use not only the inventions of the patents in suit but also the inventions of numerous other patents held by the plaintiff. Under these circumstances it cannot be successfully urged that the commercial success upon which the plaintiff relies was exclusively ascribable, if at all, to the patents in suit. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 329, 44 S.Ct. 346, 68 L.Ed. 708; Textile Machine Works v. Louis Hirsch Co., 302 U.S. 490, 499, 58 S.Ct. 291, 82 L.Ed. 382; Harvey Hubbell Inc. v. General Electric Co., 2 Cir., 267 F. 564, 568; Western Willite Co. v. Trinidad Asphalt Mfg. Co., 8 Cir., 16 F.2d 446, 450, certiorari denied 274 U.S. 737, 47 S.Ct. 575, 71 L.Ed. 1317; Cleveland Trust Co. v. Osher & Reiss, 2 Cir., 109 F.2d 917, 922; Schreyer v. Chicago Motocoil Corp., 7 Cir., 118 F.2d 852, 857; Girdler Corp. v. Abbotts Dairies, D.C., 24 F.Supp. 551, affirmed 3 Cir., 106 F.2d 998. This is particularly true here because it appears from the undisputed testimony that inventions other than those of the patents in suit were embodied in the "sizing systems" installed by the plaintiff in the mills of the licensees. The proof is, therefore, of little or no value. Ibid.

 It is generally recognized that commercial success, even where the proof is sufficient to sustain it, is an unreliable test of invention and should not be ·resorted to except where the issue of invention is in doubt. Evidence of commercial success, although persuasive in doubtful cases, is not conclusive, and will not overcome the absence of novelty and the lack of invention. DeForest Radio Co. v. General Electric Co., 51 S.Ct. 563, 283 U.S. 664, 685, 75 L.Ed. 1339; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; Toledo, etc., Co. v. Standard Parts, 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334; Kissock v. Duquesne Steel Foundry Co., 3 Cir., 37 F.2d 249, 251, certiorari denied 281 U.S. 749, 50 S.Ct. 354, 74 L.Ed. 1161; Atlantic Refining Co. v. James B. Berry Sons Co., 3 Cir., 106 F.2d 644, 650, certiorari denied 308 U.S. 623, 60 S.Ct. 379, 84 L.Ed. 520; Durand v. Bethlehem Steel Co., 3 Cir., 122 F.2d 321, 323; Pfanstiehl Chemical Co. v. American Platinum Works, 3 Cir., 135 F.2d 171, 174; Fernandez v. Phillips, 9 Cir., 136 F.2d 404, 406; General Time Instruments Corp. v. New Haven Clock Co., 2 Cir., 136 F.2d 49, 51; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 6 Cir., 139 F.2d 473, 477. The absence of novelty and the lack of invention are clearly beyond doubt in the instant case, at least in the mind of this Court, and the commercial success doctrine has no application.

### Infringement

 The issue of infringement is not debatable, and must be decided against the plaintiff. It is clear, from the undisputed testimony, that in the accused practice the precipitation or coagulation of the rosin size in the stock is effected *before* and *during,* but not *after,* "the beating action of the jordan engine is complete"; the coagulum or precipitate is thus exposed to the "beating action" peculiar to the final beating operation, notwithstanding the supposed danger of such practice. This practice is obviously a violation of the fundamental concept embodied in the claims in suit, to wit, "withholding the precipitation or coagulation of the rosin until *after* the beating action of the jordan engine is complete"; and, consequently, there can be no infringement. Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 64 S.Ct. 1110. An accused practice which does not substantially follow the method taught by the patents in suit is not an infringement. Ibid.

It seems unnecessary to review in detail the successive steps of the accused practice except to briefly note that the coagulation or precipitation of the rosin size in the stock is accomplished in the following manner: First, the rosin size emulsion is introduced into the stock at the beater chest [14] immediately ahead of the secondary jordans; and second, the aluminum sulphate is introduced into the stock at the discharge line (at the pump), which carries the stock from the beater chest to the secondary jordans. This method does not follow any of the adaptations of the purported invention.

The defendant, in its treatment and preparation of the stock, introduces a sufficient quantity of aluminum sulphate into the stock at the beater chest,[15] immediately

---

[14] This chest, which is referred to in the plaintiff's exhibit as a machine chest, is so constructed and placed as to serve as both "beater chest" and "machine chest". The terms, however, are unimportant.

[15] This chest is referred to as the "decker or jordan chest" in the plaintiff's exhibits. The terms are unimportant.

ahead of the primary jordans, to counteract the carbonates present in the hard water. This is the initial step in the chemical treatment of the stock and is followed by the steps outlined in the preceding paragraph. It is argued by the plaintiff that this practice is an infringement, but the argument is untenable. In paper mills using hard water, it has been common practice for many years to introduce aluminum sulphate into the stock to counteract the carbonates.

The plaintiff readily concedes that there is no infringement of the patents in suit if the claims thereof are strictly construed as embracing only the basic concept of "withholding the precipitation of the rosin until after the beating action of the jordan engine is complete". (Emphasis by the Court.) It is the opinion of the Court that the claims, construed in the light of the specifications and the prior art, as they must be, are not susceptible of any other construction. The alternative urged by the plaintiff, but only in support of the charge of infringement, is inconsistent with the unambiguous language of the patents, and its adoption could only result in a declaration of invalidity because of the failure of the claims to meet the requirements of R.S. § 4888, 35 U.S.C.A. § 33. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. We see no reason to discuss this alternative.

It is significant that the plaintiff not only accepted but also urged a narrow construction of the claims in an endeavor to meet the defenses of absence of novelty and lack of invention, and resorted to a broad construction only in a desperate effort to support the charge of infringement. The dilemma in which he now finds himself is one of his own creation.

### Breach of Contract

██ This is essentially a civil action for infringement under the patent laws,[16] an action ex delicto in both form and substance; the allegations of the complaint and the prayers for relief are appropriate to the action. The complaint, which is obviously duplicitous, includes an additional allegation that the infringement was also a breach of contract. This additional allegation, despite the apparent endeavor of the plaintiff to preserve both his action in contract and his action in tort, does not affect the nature of the action.

The plaintiff, in addition to his claim for infringement, asserts a claim for damages for breach of contract, which is predicated solely and entirely upon the alleged breach of a certain license agreement, which is hereinafter discussed. It is urged, in support of this claim, that the infringement was not only a violation of the duty imposed by law, independent of contract, but also a breach of an express obligation embodied in the said agreement. It is our opinion that the claim for damages for the breach of contract, as it is here asserted, is not consistent with the claim for infringement and must, therefore, be dismissed.

██ If we assume, as the plaintiff seems to contend, that the alleged infringement was not only a violation of the duty imposed by law, but also a breach of an express obligation imposed by contract, there was available to the plaintiff one of two remedies: Either an action in tort or an action in contract. It is reasonably clear that under the facts of the instant case the plaintiff could not pursue both remedies to judgment without subjecting the defendant to double liability. The maintenance of the action for infringement, under these circumstances, is such a clear manifestation of choice as to constitute a repudiation of the contract and a conclusive election of remedy. Cf. Indiana Mfg. Co. v. Nichols & Shepard Co., 6 Cir., 190 F. 579, 583, 584; Tate v. Baltimore & O. R. Co., 4 Cir., 229 F. 141, 143; N. S. W. Co. v. Wholesale Lumber & Millwork, 6 Cir., 123 F.2d 38, 41; Dellefield v. Blockdel Realty Co., 2 Cir., 128 F.2d 85, 90; Sylvania Industrial Corp. v. Lilienfield's Estate, 4 Cir., 132 F.2d 887, 890–893, 145 A.L.R. 612. The dismissal of the claim for damages for breach of contract, however, does not rest on this ground alone.

██ On November 1, 1928, the plaintiff's assignor, the former owner of the patents in suit, entered into an agreement with the defendant under which the latter acquired a limited license to use the inventions of several patents therein identified "in connection with the four paper machines * * * in its three mills at Hudson Falls, N. Y." (Emphasis by the Court.) This agreement, which included neither of the inventions of the patents in suit, was thereafter enlarged so as to include the invention of '947. The pertinent provisions of the agreement are recited in the footnote.[17]

---

[16] R.S. § 4921, 35 U.S.C.A. § 70.

[17] 1. The Engineers will license the

The claim for damages for breach of contract is predicated upon this agreement, and particularly paragraph 6 thereof, which the plaintiff avers the defendant breached by its use of the invention in its mills at *Savannah, Georgia*. This averment rests upon a construction of the said paragraph urged by the plaintiff, to wit, that the promise of the defendant "to respect the patent rights of the plaintiff" was an implied, if not an express, covenant not to use the invention in any of its mills except at *Hudson Falls, New York,* the mills to which the use of the invention was restricted.

The adoption of this construction, with which we do not agree, will not enhance the claim for damages for breach of contract. The express language of the pertinent paragraph, even under this construction, imposed upon the defendant only the duty imposed upon it by law, independent of contract, to refrain from infringing the patent of the plaintiff only if valid. The defendant's voluntary acknowledgment and assumption of this duty, embodied in the agreement, imposed upon it no greater obligation. It would seem to follow that the claim for breach of contract, like the claim for infringement, cannot be sustained by proof of the infringement of a void patent; proof of patent validity, as well as proof of infringement, is essential to the successful prosecution of either claim. We have been unable to find any authoritative decisions to support this conclusion, and there are none cited in the briefs.

The principal case relied upon by the plaintiff, United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492, involved a claim for royalties; it, therefore, has no application here. The present action, regarded as an action in contract, is not analogous to a suit by a licensor for royalties, in which the licensee, having accepted the benefits of the license agreement, is estopped to deny the validity of the patent. The estoppel is there invoked only to protect and enforce the contractual right of the licensor to his lawful compensation, the consideration of the contract.

There is a conclusive answer, however, to the plaintiff's claim for damages for breach of contract. This claim, if sustainable, can be sustained only upon proof of infringement of the patent. As we have found, there was no infringement. The claim must, therefore, be dismissed for this reason, if for no other.

### Estoppel

It is the contention of the plaintiff, however, that the defendant is estopped by the agreement to deny the validity of the patent. The contention is untenable. It seems to be well established that the estoppel peculiar to a license agreement is co-extensive only with the mutual rights of the parties as therein defined, and may not be extended by implication, or otherwise, beyond the limits fixed by the terms of the agreement. Indiana Mfg. Co. v. Nichols & Shepard Co., supra; Chance v. Lehigh Nav. Coal Co., D.C., 25 F.Supp. 532, affirmed, 3 Cir., 107 F.2d 1009; International Burr Corp. v. Wood Grinding Service, 2 Cir., 34 F.2d 905; Cf. Sinko Tool & Mfg. Co. v. Casco Products Corp., 7 Cir., 89 F.2d 916, 917. The licensor is estopped to deny the right of the licensee to the lawful use of the invention; the licensee is estopped to deny the right of the licensor to the lawful compensation for such use, and, as a necessary incident thereto, is estopped to deny the validity of the patent. The license agreement is equally determinative of the contractual rights of the parties and the limits of the mutual estoppel. Ibid.

The case of Indiana Mfg. Co. v. Nichols & Shepard Co., supra, is apposite here. The Court in that case, discussing the application of the doctrine of estoppel, said, 190 F. at page 582: "* * * it is undoubtedly the established rule of patent law in this circuit that when a licensee, who is entitled to use a patented machine under certain conditions only, undertakes to use the machine otherwise than in conformity

---

Manufacturer to use the processes described in said letters patents in the manner which they will demonstrate and subject to the conditions herein named in connection with the four paper machines now installed in its three mills at Hudson Falls, N. Y.

6. The Engineers covenant and agree to protect the Manufacturer in the use of the patented inventions set forth in this contract and the Manufacturer agrees to respect the patent rights of the Engineers and binds himself not to disclose and not to use adversely to the Engineers the confidential information revealed to the Manufacturer under this contract.

with those conditions, he loses the protection of his license and becomes an infringer (citations omitted). The principle seems to be that the license is limited in its operation, and that, since in the case of a territorial limit the license has no existence in the exempted territory, so in case of other limitations the license has no existence in the exempted field."

The Court, in further explanation of the principle, said, 190 F. at page 584:

"* * * If the complainant had licensed defendant to manufacture and sell machines in Indiana, but not elsewhere, and had then learned that the defendant was manufacturing and selling in Michigan, it might, and probably would, file an ordinary, plain infringement bill. Such a license could not then be urged by defendant as any defense, because it would not be pertinent to the act complained of; and so it would seem that, in such a bill, complainant could take nothing whatever from the existence of the license. It would be substantially accurate to say that the license did not exist in Michigan.

"The estoppel must be mutual. The licensee may not deny the patentee's title to the monopoly; the patentee may not deny the licensee's right to act under that monopoly. It is difficult to see how, when the act involved is the manufacture of a certain machine, at a specified place or in a specified way, and both complainant and defendant agree that there is no contract in existence permitting the act in controversy, either party can be estopped by a contract relating to something else.

"* * * It seems to me quite clear that the complaining patentee cannot, at the same time, maintain the position that the act of the defendant licensee, manufacturing what is said to be the patented article, is outside the conditions of the license, and, therefore, not authorized by the license, and also the position that his title to the monopoly is conceded by the license and, therefore, cannot be disputed."

This principle, as quoted, was followed and applied by Judge Kirkpatrick in the case of Chance v. Lehigh Nav. Coal Co., supra, and is apparently the rule of this circuit. That case is, likewise, apposite here.

█ The defendant in the instant case acquired nothing under the license agreement except a limited license to use the invention of the patent in its mills at Hudson Falls, New York. The consequent estoppel is co-extensive only with this limited right and may be invoked only to protect and enforce the right of the plaintiff to his lawful compensation under the license agreement. The only use of the invention, of which the plaintiff complains, was the use by the defendant in its mills at Savannah, Georgia. This use is the sole basis of the present action. It is alleged in the complaint, and sustained by the undisputed testimony, that this use of the invention was not within the purview of the license agreement. It would seem to follow that under these circumstances, and under the settled law, the estoppel cannot be invoked against the defendant to bar an otherwise available lawful defense. Indiana Mfg. Co. v. Nichols & Shepard Co.; Chance v. Lehigh Nav. Coal Co.; International Burr Corp. v. Wood Grinding Service; Sinko Tool & Mfg. Co. v. Casco Products Corp., all supra. The license agreement is, in fact, irrelevant.

The plaintiff, apparently recognizing that an estoppel does not extend beyond the scope of the license agreement, contends that the agreement of the defendant "to respect the patent rights of the plaintiff" is an unconditional promise, implied, if not express, not to contest the validity of the patent. A reasonable interpretation of the quoted language, read and considered in the light of the related provisions, as it must be, will not sustain this construction. This construction would obviously extend the estoppel beyond the scope of the license agreement, and we are not inclined to adopt it in the absence of an unequivocal recital from which it might at least be inferred that this was the manifest intention of the parties. It cannot be said that the quoted language meets this strict requirement.

█ An estoppel by contract presupposes the unconditional waiver of a legal right or defense and cannot be predicated upon an ambiguous statement which leaves the waiver doubtful or uncertain. "To work an estoppel, a recital must clearly, with particularity, beyond doubt and without ambiguity, affirm or deny some present or past fact or admit some liability definitely stated. It must be certain to every intent and cannot be taken by argument or inference; and, if the fact be not directly or precisely affirmed or recited, it shall not be an estoppel. Before an admission or recital can have such an effect, it must be so certain as to admit of no other conclusion." City of Chicago v. Joseph,

7 Cir., 95 F.2d 444, 446, certiorari denied 304 U.S. 578, 58 S.Ct. 1049, 82 L.Ed. 1542; Eskimo Pie Corp. v. National Ice Cream Co., 6 Cir., 26 F.2d 901, 902. The ambiguity, if any, must be resolved against the party invoking the estoppel, especially where, as here, the contract has been prepared under his supervision.

The findings of fact and conclusions of law required by Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, will be prepared and filed by the Court.